## Case No. 14,868..

### UNITED STATES v. CORNELL.

[2 Mason, 91.] 1

Circuit Court, D. Rhode Island.    June Term, 1820.

CRIMINAL JURISDICTION OF FEDERAL COURTS—MIL-ITARY POSTS—VENUE—DISCRETION OF COURT—SPECIAL CRIMINAL SESSIONS — VENIRE — RIGHT OF PRISONER TO COPY OF INDICTMENT—SETTING ASIDE JURORS—EVIDENCE—HOMICIDE — INTOXI-CATION—MALICE.

1. The constitution of the United States declares, that congress shall have power to exercise "exclusive legislation in all cases whatsoever." over all places purchased by the consent of the legislature of a state in which the same shall be for the erection of forts, &c. *Held*, that the right of exclusive legislation carries with it the right of exclusive jurisdiction;· and where a murder is committed within a fort so purchased with the consent of a state legislature, the circuit court has jurisdiction over the offence under the act of 1790, c. 9, §§ 3. 7 [1 Stat. 112], although in the cession the state reserved a right to execute the civil and criminal processes issuing under state authc ity in such places.

[Cited in U. S. v. Clark. 31 Fed. 711.]
[Cited in People v. Kelly, 38 Cal. 151.]

2. The legal meaning of "malice aforethought." in cases of homicide, is not confined to homicide committed in cold blood, with settled design and premeditation, but extends to all cases of homicide. however sudden the occasion, when the act is done with such cruel circumstances as are the ordinary symptoms of a wicked, depraved, and malignant spirit. As when the punishment inflicted by a party even upon provocation, is outrageous in its nature or continuance, and beyond all proportion to the offence, so that it is rather to be attributed to diabolical malignity and brutality than human infirmity. And much in these cases depends upon the instrument employed, whether dangerous to life or not.

[Cited in Tucker v. U. S., 151 U. S. 170, 14 Sup. Ct. 301.]

[3. Quære: Whether a fort or other place under the exclusive jurisdiction of the United States is to be considered as within a county of the state wherein it is situated so as to render applicable to a capital crime committed there the provision of the twenty-ninth section of the judiciary act of 1789 (1 Stat. 118), which declares "that in all cases punishable with death, the trial shall be had in the county where the offence was committed; or where that cannot be done without great inconvenience, twelve petit jurors, at least, shall be summoned from thence."]

[4. The court has no power to adjourn a general stated session from the place at which it is directed by statute to be held, to another place, for the purpose of trying there a person indicted for a capital crime, in compliance with the provisions of the 29th section of the judiciary act of 1789.]

[5. Quære: Whether the provision in the third section of the act of March 2, 1793 (1 Stat. 333), that the supreme court, or a justice thereof, together with the judge of the district, may direct special sessions of the circuit courts to be holden for the trial of criminal causes, at "any convenient place" within the district, nearer to the place where the offences are alleged to have been committed than the place appointed by the ordinary sessions, does not modify or repeal pro tanto the provisions of the fifth and twenty-ninth sections of the act of 1789.]

[6. The fifth and twenty-ninth sections of the act of 1789, even if still in full force, contem-plate that the prisoner may rightfully be tried at a regular stated session of the court: and that it is in the discretion of the court to appoint a special session upon considerations of inconvenience. The prisoner may be tried at a regular session without an express adjudication by the court that there would be inconvenience in having the trial at a special session. where neither the prisoner nor the United States makes any application to the court upon the subject or any objection to the time or place of trial.]

[7. Even if the court, of its own motion, might have ordered a special session within the county where the crime was· committed, yet it would have no authority to try the prisoner upon an·indictment which was not found at such special session. but at the regular session of the court; and, after the finding of an indictment at the·general session, it is doubtful whether another indictment for the same offence could be found at the special session while the former remained undetermined.]

[Cited in Memorandum, Case No. 9,411.]

[8. A motion for a special session comes too late after an indictment found at a general session. and a fortiori when a trial has been had upon such indictment. The right to trial in the county where the offence is committed is a privilege granted to the prisoner. He is not bound to insist upon it. and may waive it, and require an immediate trial. Hence, where an indictment might be tried in the county where the offence was committed by obtaining a continuance until the next stated session of the court, which, by law, is required to be held at a place in that county, but ·the prisoner fails to move for a continuance, this is a waiver of his right, and the trial of the case out of that county cannot thereafter be insisted upon as invalidating the verdict.]

[9. It is no objection to the verdict that the venire was issued and served before the indictment was returned, where the jury is not drawn for a single cause, but the panel is returned to serve in all proper causes, civil as well as criminal, which may be pending at the term.]

[10. The fact that the copy of the indictment furnished to defendant two entire days before his trial (Act April 30, 1790, c. 9, § 29) was not a true copy, in that the words "a true bill" indorsed thereon by the grand jury were omitted. is waived where the prisoner makes no objection on that ground, and admits, while acting under the advice of counsel, that he has had the benefit of the statute.]

[Cited in U. S. v. Curtis, Case No. 14,905.]

[11. If a juror attend the court for which he is regularly drawn. this is sufficient, and no exception lies as to his competency based on the fact that he was not warned to attend as directed by the statute.]

[Cited in Northern Pac. R. Co. v. Herbert, 116 U. S. 646, 6 Sup. Ct. 592.]

[12. The fact that the court set aside certain jurors because they were Quakers, without any objection being made to them by either party; and upon their statement, not under oath, that they were such, is no ground of exception. The fact being well known. and there being no doubt of their veracity. it was not necessary that they should be sworn.]

[Cited in U. S. v. Wilson, Case No. 16,730; Logan v. U S., 144 U. S. 298, 12 Sup. Ct. 628.]

[Cited in Montague v. Com., 10 Grat. 770; Sutton v. Fox, 55 Wis. 540, 13 N. W. 480; Williams v. State, 32 Miss. 389.]

[13. Where, after the evidence was closed and the district attorney had finished his argument to the jury, the court, after adjourning over Sunday, permitted the United States to introduce the records of the town to show a conveyance of the locus of the crime, as affecting the jurisdic-

1 [Reported by William P. Mason, Esq.]

tion of a federal court, together with the explanations thereof by the town clerk, *held*, that it was not an abuse of discretion to refuse to allow defendant's attorneys to ask additional questions in respect to the incidents immediately preceding the crime, where no new witnesses were offered and no new facts suggested.]

[14. If it is not suggested that one accused of murder is not deficient in understanding, it is no defense that he was more ignorant and somewhat more stupid than common men of bad education, bad passions, and bad habits.]

[15. That the prisoner was more or less intoxicated at the time of committing a homicide is no excuse or mitigation of the crime.]

[This was an indictment against William G. Cornell, for the murder of William Kane. At the trial there was a verdict of guilty of murder. Case No. 14,867. Heard on motion for a new trial.]

This motion for a new trial was made at the last November term, at Providence, and was continued over to this term for argument. It contained the following causes for a new trial: First. That the trial of said indictment was not had in the county of Newport, where the said supposed offence was committed; but in the county of Providence; although said trial might have been had in said county of Newport, without "great inconvenience." Secondly. That the said court did not decide, that it was greatly inconvenient to have said trial in said county of Newport, after first allowing said Cornell an opportunity to be heard upon said question. Thirdly. That the venire or order for summoning the jury who were to try said indictment, was issued and served before the said bill of indictment was found by the grand jury. Fourthly. That said court had no jurisdiction to try said indictment, the place within which said offence was supposed to have been committed, not being proved in said trial to be within the sole and exclusive jurisdiction of the United States aforesaid. Fifthly. That said Cornell had not a true copy of said indictment, two full days before his trial; the words, "a true bill," endorsed thereon by the grand jury, not being contained in the copy which was delivered to said Cornell. Sixthly. That jurors from the town of Portsmouth, who were summoned in said cause, were not legally warned to attend said court; being warned by the town clerk of said town, and not by the town sergeant, as by the statute of Rhode-Island it is required; and the jurors from the town of Newport, who also were summoned in said cause, and sat in said trial, were not legally warned to attend said court, being warned by a constable of said town, to whom said summons was directed. Seventhly. That the said court did set aside two jurors who were summoned in said cause, upon said jurors expressing, without being under oath or affirmation, that they had conscientious scruples against sitting as jurors in said cause, and without said jurors being challenged either by the said Cornell or the district attorney.

Eighthly. That, at said trial, the said court rejected evidence which was offered by said Cornell, to show the manner of the education of said Cornell, in order to mitigate and extenuate said offence, and to show it was only manslaughter. Ninthly. That after the said Cornell's defence was closed to the jury on Saturday evening, the said court adjourned till Monday morning, and then permitted the district attorney to introduce new and further evidence in said cause; to wit, the testimony of Jonathan Almy, and the records of the town of Newport. And immediately after the introduction of said evidence, the said Cornell offered further evidence to explain the facts in said cause, and to prove his defence, which was not objected to by the district attorney, but rejected by the said court; and the said Cornell prayed to be then further heard by his counsel in said cause, which was denied by said court, except as to the testimony of Jonathan Almy, and said records. The principal witnesses by whom said Cornell expected to prove said further facts, having already been examined in said cause. Tenthly. That said court in their charge to the jury, did not instruct them, that said Cornell being on guard at the time of said transaction, increased the provocation given by the deceased, and although they instructed said jury, that in cases of this kind, much depends upon the instrument or weapon with which the mortal blow is inflicted, said jury were not informed that the weight of this circumstance was lessened in the present case, by the musket being lawfully in said Cornell's hands at the time. Eleventhly. That the said court instructed said jury that the said Cornell being deficient in understanding, or having received a bad, or little, or no education, should have no effect to mitigate, extenuate, or lessen, or in any degree to answer or apologize for said offence, and also did instruct said jury, that they had a right, and it was their duty to weigh the evidence in said cause. Twelfthly. That since said trial, evidence has been discovered, which was before unknown to said Cornell, or his counsel, that Benjamin Raymer, a witness in said cause, who testified to previous threats used by said Cornell towards the deceased, did say, previous to said trial, that "he would do all in his power to hang said Cornell." Thirteenthly. That since said trial, the said Cornell has discovered new and further evidence, to wit: that of Isaac Wilmot, who was summoned by said Cornell to attend said trial, but who was confined by sickness at Newport; and this fact was not known till the said trial had commenced: That said Wilmot, had he been present at said trial, would have testified that the said deceased insulted and threw gravel-stones at said Cornell, while on post, on the night of the said fourth of July; and also that the gravel-stones which were proved to have been thrown by the said deceased, at said Cornell, hit him on his face and back, and were thrown with great violence and an-

ger; and that he expects· said Wilmot will testify to said facts, should a new trial be granted. Fourteenthly. That the further evidence mentioned above in · said ninth cause, and which may be had at a new trial, should such trial be granted, would show that all the soldiers in said garrison or fort, had as· much liquor as they wanted, and many of them, including several of the United States' witnesses, and more especially the said deceased,. were intoxicated at the time of said transaction.

Rivers & Correns, for prisoner.
Mr. Robbins, U. S. Dist. Atty.

STORY, Circuit Justice. The motion for a new trial in this case, was filed at the last term of the court, and together with some new grounds now for the first time suggested, has been argued with uncommon diligence by counsel. If I felt any doubt as to the principles of law involved in the discussion, I should take time to consider them. In any case, where a reasonable doubt lingered in my mind, I should pause a long time. before I should pronounce judgment. In a capital cause, every motive of humanity and justice, combining with the precepts of the law, would compel me to postpone a decision until all such doubts were dissipated. I never will be instrumental in taking away life, until I am clearly persuaded that the law imposes upon me this painful and melancholy duty. .On the present occasion, however, on the most mature reflection, I am constrained to say, that I entertain no doubt as to the law of the case; and, however reluctantly, I am bound to overrule the motion for a new· trial. I might indeed postpone judgment to another term; and ·if I thought that there could be any benefit in such a course, I would cheerfully pursue it. But it would be injustice to the public, and scarcely be mercy to the prisoner, to keep him in a state of apparent suspense, when there was no reasonable hope of coming to a conclusion that must not be unfavourable to him.    .

I will now proceed to give briefly my reasons for overruling the motion for a new trial, premising that the reasons filed; do not present a fair and just state of the case. I dare say, this was done without any design to misrepresent, but from a desire to present every objection in the manner best adapted to avail for the prisoner. There are many omissions and mistakes in these reasons, which give an untrue colouring to the cause, and do injustice to the court. When any part of a charge is excepted to, it should be stated with accuracy, and with all the qualifications and circumstances which belonged to it, as it was delivered. However, I do not complain: it is sufficient to say, that I enter my protest against its being taken for granted, that the language and doctrines imputed to the court,

are accurately stated either in substance or form. I will pursue the order of the causes assigned for a new trial, by the counsel themselves.

1st and 2d. As to the first and second causes. The judicial act of 1789, c. 20, § 11 [1 Stat. 78]; gives exclusive cognizance to the circuit courts, "of all crimes and offences cognizable under the authority of the United States," with some exceptions, not material for our present consideration. It is clear that the circuit courts have jurisdiction over the offence of murder, for it is not pretended to be within any exception contemplated by the act; and if this crime be committed in any place under the exclusive authority of the United States, within this district,  (as in the present case it was) it follows that this court has jurisdiction to hear and try it; for the statute contains no limitation of places within the district, where the jurisdiction is to be exclusive. The grand jury then, at the last term of this court, at Providence, were fully authorized to inquire into this particular offence, and the indictment found by them against the prisoner, was then and there regularly before the court. This doctrine has not, as far as my knowledge extends, ever been brought into judicial doubt in any of the capital trials which have taken place since the passage of the statute. It has been denied, however, in.the present case, plain and incontestable as it seems to be, and that, as I gather, principally with a view to sustain the objection· contained in the first and second causes assigned for a new trial. And yet if the doctrine be not well founded, it is extremely difficult to perceive what jurisdiction the circuit court sitting at Newport, could possess over the offence, for no other clause of the statute specifically gives it; and yet the objection itself admits it. The principal objection is founded on another section of the act of 1789. The 5th section of that act declares, "that the circuit courts shall have power to hold special sessions for the trial of criminal causes at any other time at their discretion," than the regular terms prescribed by law. And the 29th section of the same act declares, "that in all cases punishable with death, the trial shall be had in the county where the offence was committed; or where that cannot be done without great inconvenience, twelve petit jurors at least, shall be summoned from thence." The · argument is, that this last section is peremptory upon the court, to try the cause in the proper county, unless there be great inconvenience; and that such an adjudication ought to be solemnly made by the court upon argument in behalf of the prisoner, before it can proceed to the trial in any other county.

Now in the first place, it may admit of doubt, whether this clause of the statute was meant to apply to any crimes · against the United States, excepting such as should

be committed within the body of some county of the state. . The place where the crime was committed by the prisoner, was a fort, ceded to and within the exclusive jurisdiction of, the United States. Strictly speaking, it was not within the body of any county of Rhode Island, for the state had no jurisdiction there. It was as to the state as much a foreign territory, as if it had been occupied by a foreign sovereign. I mention this only in passing, not meaning to rely on it, and suggesting it only for further consideration, whenever any case may specially require it.

To proceed with the objection. Every statute must have a reasonable construction: and every clause in it is so to be construed as if possible to avoid any repugnancy, and to give effect to all the provisions. If the indictment was well found by the grand jury, at the term at Providence, and the court there had jurisdiction of it, as in my judgment is beyond the reach of any legal doubt, our first inquiry naturally is in what manner the trial could be removed to the county of Newport, supposing the crime to be committed there. There is no pretence to say, that the statute anywhere authorizes a general stated session of the circuit court to be adjourned to any other place or county, than that in which it is directed to be first holden. If it can be done for one cause pending in the court, it may be done for all; yet it never was imagined, that a circuit court directed to be held at Providence, could at the option of the judges, be adjourned to meet at Newport or Bristol. The statute by naming a particular place, has been always supposed to exclude every other. And in my judgment, there is no ground upon which any other construction can reasonably be given to it. But if it were merely a matter of doubt, the court ought not to direct an adjournment; for the business of a court of justice is too serious and important to run the hazard of having all the proceedings void for want of jurisdiction; if no such right of adjournment should exist, all that should be done on such adjournment, would be coram non judice. In fact, the counsel for the prisoner do not contend that such a power of adjournment of a general stated term does exist.

Then as to a special session to be holden for the trial of criminal causes. This is provided for in the 5th section of the act of 1789, already quoted. It is remarkable, however, that in terms it only authorizes such special courts to be holden at any other time than the general sessions, but contains not one word as to the place where such special sessions are to be holden. And if this section were to be construed by itself, it would be difficult to show that the special sessions were not by necessary implication to be held at such places only as the general sessions enumerated in the preceding part of the section. But with reference to the exigency of the 29th section, it may perhaps be fairly construed to authorize such special sessions in cases punishable with death, in the county where the crime is committed. Vide [U. S. v. Insurgents of Pennsylvania], 3 Dall. [3 U. S.] 513. Yet, if at such a special session, an indictment for murder should be found, and the prisoner on his trial be convicted of manslaughter only, it might deserve consideration whether the court could proceed to award judgment upon the verdict. It is also matter of very earnest inquiry, how far these sections have been modified or repealed by the 3d section of the act of 2d of March 1793, c. 22 [1 Stat. 333]. That section declares, that the supreme court, or when it is not sitting, any one of the justices thereof, together with the judge of the district, within which a special session as thereafter authorized shall be holden, may direct special sessions of the circuit courts to be holden for the trial of criminal causes, at any convenient place within the district, nearer to the place where the offences may be said to be committed, than the place or places appointed by law for the ordinary sessions. I do not profess to know the history of this provision, but I cannot but suspect, that it grew out of the very difficulties, which have been above suggested. It embraces "criminal cases" generally, and therefore includes capital cases as well as others. It provides for holding special courts not in the county where the crime is committed, as in the act of 1789, but at any convenient place nearer the place where the offence is said to be committed, than the place appointed for the regular sessions; and it further provides that such special sessions may (not shall) be holden, leaving the appointment of course to the sound discretion of the judges; as indeed it had been left by the former act. It appears to me that this section from its whole scope, was intended to operate as a material modification, and in some respects as a repeal pro tanto of the provisions of the 5th and 29th sections of the act of 1789. The provisions of these acts are not in all respects compatible; and wherever the authority confided by the last act is exercised, it manifestly excludes the exercise of like authority under the first. I have seen and considered the case of U. S. v. Insurgents of Pennsylvania, 3 Dall. [3 U. S.] 513, on this point; and it has not at all shaken the opinion I had previously formed.

But supposing the clauses in the 5th and 29th sections of the act of 1789, to be in full force in all respects, still they contemplate in the plainest manner that the prisoner may rightfully be tried at a regular stated session of the court; and that it is in the discretion of the court to appoint a special session. This is the positive language of the 5th section, and though the language of the 29th section, as to capital cases, uses the impera-

tive "shall," yet it leaves .the case to be judged of in the discretion of the court upon considerations of inconvenience, and has been uniformly so interpreted. [U. S. v. Hamilton] 3 Dall. [3 U. S.] 17; [U. S. v. Insurgents of Pennsylvania] Id. 513. It is very true that in the case at bar, the court did not adjudge that there would be any inconvenience in trying the offence at a special session; and this arose from the obvious cause, that neither the United States nor the prisoner, ever applied. to the court on the subject. No objection was made by either party to the time or place of trial; and unless upon motion by some party, I do not perceive that the court was bound to order a special session.

But admitting that the court might have ordered a special session in this case ex mero motu, still it seems to me that if it were ordered, unless the indictment were found at such special session, there could be no trial of the prisoner at such special session. He could not be tried upon an indictment found at a regular stated session, because no authority is by law given to remove an indictment found at such session to any special session. It must be tried at a regular stated session and none other. This was manifestly the opinion of the supreme court in the case of U. S. v. Hamilton, 3 Dall. [3 U. S.] 17. and acted upon in the case of U. S. v. Insurgents of Pennsylvania, Id. 513. The indictment, therefore, found against the prisoner, could not have been removed to any special session; and after such an indictment found at a general session, there seems to me extreme difficulty in admitting that another indictment for the same offence could have been found at any special session, while the former remained undetermined. There are other difficulties in respect to a special session, which are stated in the cases above cited, which it would hot be easy to overcome; but that already mentioned is decisive. The indictment being regularly found at a general session, could only be tried at such session; and the court, therefore, if it had been applied to for this purpose, would have been compelled to deny the application. I agree, also, to the soundness of the doctrine in [U. S. v. Insurgents of Pennsylvania] Id. 513, 514, that a motion for a special session comes too late after an indictment found at a general session; and a fortiori it comes. too late, when a trial. has been had upon such an indictment. For the reasons already suggested. we may safely conclude that no special session could have been properly held after the indictment was found; and if held, the court would have been without competent authority to try this indictment at such special session. And certainly it can be no error in the court not to have exercised a discretion which it was not called upon to exercise.

Still, however, the trial in the present cause, might have been had in the county of Newport, by continuing the cause to the next general session of this court, which by law is required to be at that place. And if any application had been made to the court for this purpose, it would have been most cheerfully acceded to. But no such application was made; the objection was indeed taken after the trial had commenced, but was urged at that time not to procure a continuance, but to procure a verdict of acquittal, upon the ground that the whole proceedings were coram non judice. The right to a trial in the county where the offence is committed, is a privilege granted to the prisoner. He is not bound to insist upon it, unless he chooses. He may waive it, and require an immediate trial. In fact, when a person is in custody on a charge for any offence, if no indictment be found against him, at the next term of the court, he is regularly entitled to be discharged, unless a very special cause be shewn to the court, authorizing a further detention. If an indictment be found, he is entitled to an immediate trial at the same term, unless the most weighty reasons to the contrary exist. The law will not endure that a man shall be kept in confinement for six months after a regular term of the court, when it is uncertain whether he has committed any offence or not. Such confinement would be an extreme hardship, and operate as a punishment upon a man whom a jury may pronounce guiltless. It is, therefore, only under extraordinary circumstances, that courts of justice allow delays in such cases. And when the indictment is for a capital offence, every reason of justice and of convenience, both to the public and to the prisoner, still more forcibly applies. But where neither the government nor the prisoner apply for any delay, where, as in the present case, both parties professed to be ready for a trial, and were earnest for it; where no objection to the course is hinted at from any quarter, it would be an extraordinary use, not to say abuse, of the discretion of a court to compel the parties to undergo the inconveniences of a long delay, whereby they might be in danger of losing part of their testimony, or of having unfavorable impressions excited against them. It appears to me, therefore, that in the present case, the court, when the parties were ready, was bound to proceed to the trial; and as the prisoner neither asked nor wished a trial at Newport, he waived any benefit and avoided any disadvantage to be derived from the provision of the act. (supposing it in force,) addressed to that object. He had the full benefit of a fair trial by impartial men, and sixteen of the panel were summoned from the county of Newport. The court, therefore, followed out in the most liberal manner, the directions of the act. And I may add, never was a criminal convicted upon plainer or more conclusive evidence. Hav-

ing spoken thus largely on these points, I proceed to the third exception.

3d. As to this little need be said. The jury were summoned from the proper county; and were summoned in the only way known to our laws. Here, a jury is not drawn for a single cause, but the panel is returned to serve in all proper causes, civil as well as criminal, which may be depending at that term before the court. It was apparent, that if an indictment was found against the prisoner, there would be a defect of jurymen, if he exercised the full right of challenge; and the court did only its duty in providing in the speediest manner for this defect according to the known, settled, and universal usage in like cases. This objection is not now insisted upon; and I therefore pass it over without any farther. notice. And see U. S. v. Fries, 3 Dall. [3 U. S.] 515.

4th. The fourth exception was fully considered at the trial; and I have pondered upon it deliberately since; and am entirely satisfied that the charge of the court was correct in point of law; and I have nothing further to add to what has been already suggested.

5th. The fifth exception admits of a short reply. The prisoner was asked before his arraignment if he had received a copy of the indictment two entire days before his trial, according to the provisions of the act of 30th of April, 1790, c. 9, § 29. He admitted that he had. And there is no pretence to say, that the omission alluded to, was in the slightest degree prejudicial to him. The right to a copy is a privilege granted by the law for his benefit, and he is at liberty to receive it, if he pleases. By his conduct on this occasion he did waive it, and that too at a time when he had the full benefit and advice of counsel. He might have expressly waived having any copy; and in such a case could it be justly said that there was a mis-trial? In the nature of things, this is a preliminary proceeding, and if not insisted upon before pleading and trial, the objection cannot afterwards be insisted on. Mr. Justice Foster, in commenting on an analogous provision of the statute 7 Wm. III. c. 3, § 1, and 7 Anne, c. 21, § 11, after stating that a copy of the caption of the indictment ought to be delivered, says: "But if the prisoner pleadeth without a copy of the caption, as some of the assassins did, he is too late to make that objection, or indeed any other objection that turneth on a defect in the copy, for by pleading he admitteth that he hath a copy sufficient for the purposes intended by the act." Foster, Cr. Law, Discourse 1, c. 3, § 6, pp. 229, 230. And this doctrine has been recognized as good law ever since. Rockwood's Case. 4 State Tr. 667; 1 East, P. C. c. 2, § 49, p. 113.

6th. The sixth exception turns upon the language of the statute of Rhode-Island respecting jurors, which directs that the jurors drawn to serve at any court, shall be warned to attend by the town sergeant, six days before the court at which they are to serve. Laws R. I.

1798, pp. 182, 183. This is plainly a mere direction to the public officers to prevent a defect of jurors. It has nothing to do with the qualifications of jurors, or with the regularity of their draft. The jurors are not less qualified because they attend without warning; although, if not warned, they certainly are not liable to any penalty for non-attendance. Even in the state courts of Rhode-Island, this exception must be utterly nugatory. If a juror attend the court, for which he is regularly drawn, it is sufficient, and no exception on this account lies to his competency. Assuming, therefore, that the state laws as to these collateral proceedings, are, under the acts of congress (Act Sept. 29, 1789, c. 20, § 29; Act May 13, 1800, c. 61 [2 Stat. 82]), obligatory upon this court, (which is assumed merely for the sake of the argument) there is nothing in the objection. There is another answer equally conclusive. The jurymen from Portsmouth, though returned on the panel, did not sit in the cause, but were put aside for another cause. The prisoner made no challenge to the array or to the polls on this account. Indeed the setting aside of these jurors, and not suffering them to be sworn on the jury, constitutes the next exception in the case, and is entirely repugnant to the present. If the prisoner was tried by lawful jurors, it is after the trial utterly unimportant what were the defects of other jurors, who were summoned and were not sworn.

7th. The seventh exception may be disposed of in a very few words. When the jurors mentioned in this exception, were called to be sworn, they both appeared to be Quakers, and excepted to themselves as disqualified, because they were conscientiously scrupulous of taking away life, and did not think themselves impartial in a capital cause. In point of fact, one of them is now of the sect of Friends or Quakers, and the other professes their tenets, but has latterly been excluded from their meetings. It is well known, that the Quakers entertain peculiar opinions on the subject of capital punishment. They believe men may be rightfully punished with death for the causes set down in the divine law, but for none others; and in point of conscience they will not give a verdict for a conviction where the punishment is death, unless the case be directly within the terms of the divine law. Now it is well known to us all, that our laws annex the punishment of death in several cases where the divine law is silent, and under circumstances different from those expressed in that law. To compel a Quaker to sit as a juror on such cases, is to compel him to decide against his conscience, or to commit a solemn perjury. Each of these alternatives is equally repugnant to the principles of justice and common sense. To insist on a juror's sitting in a cause when he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict ac-

cording to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt, the proceedings of courts of justice. We do not sit here to procure the verdicts of partial and prejudiced men: but of men, honest and indifferent in causes. This is the administration of justice which the law requires of us; and I am not bold enough to introduce a practice, which corrupts the very sources of justice. The objection, however, affects to place some reliance upon the fact, that the jurors were not sworn or affirmed to the truth of their statements. But this was surely unnecessary, where no doubt was entertained of their perfect veracity. I agree with the doctrine laid down in the book cited by the prisoner's counsel, that where the jurors challenge themselves, they may be sworn to the truth of their asseverations. 1 Chit. Cr. Law, 443. But when these are undoubted, of what use can it be to make assurance doubly sure? I may add, that in all the courts of New-England, where I have seen practice, the course pursued on this occasion, has been uniformly adopted. I do not deny, that the facts to establish a lawful challenge to the polls may be ascertained by triors according to the course of the common law; all I assert is, that this is not the usual or necessary mode with us; and least of all is it proper, where the facts are not disputed, and the cause of challenge is apparent and admitted, and resolves itself into a mere point of law. Even if a juror had been set aside by the court, for an insufficient cause, I do not know that it is matter of error, if the trial has been by a jury duly sworn and impanelled, and above all exceptions. Neither the prisoner nor the government in such a case have suffered any injury.

8th. I pass over the eighth exception, because it is abandoned by the counsel for the prisoner, with the single remark, that if a bad or low education would in point of law justify or excuse crimes, it would be the most facile mode of avoiding punishment that could be devised; for to this cause is generally to be attributed many of the most shocking crimes and immoralities committed in all countries.

9th. The ninth exception presents a specious, but when the facts are ascertained, a most delusive objection. The trial commenced on Friday, and the whole evidence was gone through on both sides by Saturday noon. The counsel for the prisoner were then indulged with the utmost latitude of discussion, and occupied the attention of the jury for nine hours, and then came voluntarily to a conclusion of their arguments. In the course of the trial, it became necessary to ascertain whether the land, on which the crime was committed, had been granted by the proprietors, as well as ceded by the state, to the United States. Copies were produced from the proper town records, (where, by the laws of the state, all deeds of lands lying in the town are recorded) duly certified; but upon inspection of these copies, it was apparent that the certifying officer, from the great haste in which these copies had been made, had erroneously stated the dates of one or more of them. The real dates were scarcely susceptible of doubt. But under all the circumstances, it was thought advisable to send for the original records, and they were accordingly brought into court, by Mr. Almy, the town-clerk, on Monday morning, (the court having been adjourned from Saturday evening to give the district attorney an opportunity to close the case) and Mr. Almy was then sworn to the single fact, that these were the original records, and upon inspection, the errors in date were immediately detected and admitted by the counsel for the prisoner. Application was then made by the counsel for the prisoner to the court, to permit them again to interrogate the witnesses, who had been produced on the part of the United States, as to a single fact, (the fact stated in the thirteenth exception) to wit: that the soldiers had had more liquor on the day the offence was committed, than usual, and as much as they wanted, so as to raise an inference, that they, or some of them, as well as the prisoner, were intoxicated. Every one of these witnesses had been interrogated by the prisoner's counsel upon their prior examination again and again, as to this fact, and every one gave a distinct decisive answer in general, negativing any notion of intoxication. They stated the quantity of liquor which had been given; and the whole testimony on this point was fully sifted by the prisoner's counsel in their argument. It is to be observed, that the defence of the prisoner did not turn upon any doubt of the testimony as to the principal facts. It was admitted that he killed the deceased; that he did it voluntarily; that the prosecution was truly stated. The principal grounds of defence were, that the provocation was such as legally reduced the crime from murder to manslaughter; that the prisoner was intoxicated at the time, and this was a legal extenuation of the crime, that is to say, that murder committed by a drunken man, is ipso facto reduced to manslaughter; that Cornell was an illiterate man, of gross and furious passions; and that a crime which would be murder in an intelligent moderate man of reasonable discretion, could be but manslaughter in the prisoner, because of his ignorance and his furious passions. The court were of opinion, that under all the circumstances of the case, there was no reasonable ground for entering again upon a re-examination of the testimony, on the point above stated. It was an application to their sound discretion, and should have been granted only when it was manifest that public justice required it. Here, no new witnesses were offered, no new facts were suggested. The witnesses had already deliberately given their testimony on the very point, and it had been deliberately examined. There was nothing but a suggestion of counsel, that they might be able to draw forth contradictory answers from the

same witnesses; a thing certainly not to be presumed at such a time, and upon such a trial. And the bearing of the facts upon the merits of the case, in point of law, was so slight, that in the opinion of the court, it was a waste of time to dwell longer upon it. It had the air of pressing a solemn defence against all the principles of law, and of grasping after shadows to postpone a verdict. The court felt that the dignity of the law, and the justice of the country, ought not to be left open to the imputation of being but a solemn trifling.

10th. The tenth exception has been almost abandoned by the counsel. The suggestions of the court, that the nature of the weapon, by which the death is inflicted, is often extremely material in cases of homicide, were made in order to explain the doctrines of the cases cited by the counsel for the prisoner. There was no room for the application of the principle of such cases to the present, for it was proved and admitted, that the prisoner intended to kill, and that his musket was a deadly weapon. Nor could it have been proper for the court, in the prisoner's case, to have stated that his being lawfully possessed of the musket, made any legal difference as to the crime. God forbid that it should ever be supposed to be law, that the lawful possession of a deadly weapon, justifies or excuses any man in the commission of murder. But surely the omission of the court to state a circumstance, which may be material for the prisoner, is not matter of error. In a long and complicated cause, such an omission may and certainly sometimes does occur; but it is always in the power of counsel, by suggesting the omission, to recall the fact to the attention of the court, and then to prevent any injury. If this course had been pursued on the present occasion, the suggestion would have been cheerfully listened to. But it could have been of no avail, unless we are ready to uproot the foundations of the law.

11th. The eleventh exception has been explicitly abandoned, and for the best reasons. There is no pretence to say, that the prisoner is in any legal or accurate sense, "deficient in understanding." It was proved by all the witnesses, by his own witnesses, it was admitted by his counsel, that he was compos mentis, having intelligence to discern what was right and what was wrong. All that was suggested was, that he was more ignorant and somewhat more stupid than common men, of bad education, and bad passions, and bad habits. Now these are precisely the common causes of crimes; but certainly they form no legal excuse or justification for the commission of them. As to the other part of the exception, that the court instructed the jury that "it was their duty to weigh the evidence in the cause," I profess not to be able to comprehend the nature of the objection to it. I had always humbly presumed that such was the duty of every juror in every cause. Juries are not to give a blind verdict, merely because witnesses swear to the existence of certain facts. They are to examine those facts, to consider the credibility of the witnesses, to weigh the force and ascertain the value of the testimony, and to give a verdict according to their oaths and their consciences. Upon any other supposition of duty, juries would be a most fraudulent imposition upon the public, and a mischievous appendage to the administration of justice. Until I can learn a different rule, I shall continue to believe, that to weigh evidence is of the last importance in all judicial tribunals, and is so emphatically the duty of juries, that to abandon it, is to jeopard their consciences and violate their oaths.

These are all the original exceptions filed in the cause. But three additional exceptions are now offered, which I will briefly consider, however irregularly they may have come to my notice.

12th. The twelfth exception turns upon new evidence discovered since the trial. In order to justify the court in granting a new trial for such cause, it should be most manifest that injustice has been done the prisoner, or that the new evidence would materially vary the complexion of the cause. The new evidence as now stated, (for it rests in mere assertion, and there is not even an affidavit to sustain it) goes merely to the credibility of Raymer's testimony. Now it is somewhat remarkable, that the testimony of this witness as to the only fact, to which he singly spoke, the fact of a previous quarrel and threat of revenge by the prisoner, was commented on at large by the court, and the jury were expressly advised to consider that quarrel and threat as merely a sudden ebullition of passion, and affording no proof of any previous deliberate malice in the prisoner. There is not the slightest reason to suppose that the jury did not act upon this advice. As to all the other facts in the case, they were proved by four or five unimpeached and unimpeachable witnesses; and indeed, as has already been remarked, the material facts were admitted by the prisoner's counsel. The verdict was in my judgment most entirely justified by the principles of law and by the evidence. It was as clear and unequivocal a case of murder, as I ever recollect to have tried in a court of justice. Under such circumstances, if the court were to grant a new trial, it would surrender itself to a most unpardonable abuse of the discretion committed to its charge.

13th. The thirteenth exception is abandoned by the counsel, because it cannot be sustained, and I need not comment on it.

14th. The last exception has been in some measure anticipated. If the prisoner was at the time of committing the offence, intoxicated, as his counsel have earnestly contended, I cannot perceive how it can, in point of law, help his case. This is the first time, that I ever remember it to have been contended, that the commission of one crime was an ex-

cuse for another. Drunkenness is a gross vice, and in the contemplation of some of our laws is a crime; and I learned in my earlier studies, that so far from its being in law an excuse for murder. it is rather an aggravation of its malignity. 4 Bl. Comm. 25; 1 Inst. 247; 1 Hale, P. C. 32; Plowd. 19. If it be fit, that another rule of law should prevail, it will be for the legislature to prescribe it. It is my duty to administer the law upon its settled principles; and I confess, that I do not well know, how a doctrine more dangerous to the peace and good order of society, could be established than that the vices of men, (as this voluntary madness is,) should constitute an excuse for their crimes.

I have gone over all the causes assigned for a new trial; and I have no hesitation in declaring that they afford not the slightest foundation to sustain it. It would have given me more satisfaction, if I could. consistently with the dictates of my judgment, have come to a different result. If there are any circumstances in the prisoner's case entitling him to mercy, it belongs to another department of the government to administer it. I overrule the motion for a new trial.

Motion overruled, and sentence of death pronounced.