STEWART *v.* KEYES ET AL.

No. 142.   Argued December 6, 1934.—Decided May 20, 1935.

*Mr. William Neff* for appellant.

*Mr. Richard H. Wills*, with whom *Messrs. James C. Denton* and *A. M. Beets* were on the brief, for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a suit brought in a court of Seminole County, Oklahoma, by a full-blood Creek Indian to recover an

interest in land inherited from his grandmother, also a full-blood Creek Indian, and afterward sold by his guardian. The asserted grounds for a recovery were (1) that the proceedings whereby the plaintiff was adjudged an incompetent and subjected to guardianship on that basis, and also the proceedings leading to the sale, were invalid, because in some particulars irregular or not in accord with the laws of Oklahoma; (2) that the sale was in contravention of a controlling federal restriction on alienation; and (3) that an act of Congress of April 12, 1926, c. 115, § 2, 44 Stat. 239, permitted the suit to be brought within two years after the act's approval notwithstanding any bar which may have arisen under the state statutes of limitation before such approval.

The defendants answered and a trial was had at which judgment was given for them on a demurrer to the plaintiff's evidence. The Supreme Court of the State affirmed the judgment, 167 Okla. 531; 30 P. (2d) 875, and put its decision on the grounds (a) that the suit was barred by the state statutes of limitation and (b) that the act of Congress of April 12, 1926, relied on by the plaintiff as avoiding such a bar, could not be applied, because, if applied, it would deprive the defendants, who are holding under the guardian's sale, of vested rights without due process of law. The court's opinion did not mention the federal restriction on alienation set up by the plaintiff; but, of course, the judgment necessarily meant that the court regarded the asserted restriction as not requiring a different result.

The plaintiff brings the case here by appeal and complains that the Supreme Court of the State erred (1) in applying the state statutes of limitation over his objection that they could not be applied without bringing them into conflict with the federal statute restricting alienation, and (2) in holding the act of Congress of April 12, 1926, invalid as applied to the situation disclosed.

The facts in the light of which these complaints are to be considered are as follows:

The plaintiff and his grandmother were full-blood Indians of the Creek Tribe, enrolled as such, and entitled to share in the allotment of the tribal lands among the members. She died before receiving her allotment, and after her death the land in question, which was part of the tribal lands, was allotted and patented in her right, the patent being issued to her " heirs " without naming them. Under the applicable statute the heirs received the land as an inheritance from her and not as an allotment in their own right.[1] The plaintiff was one of the heirs. He also received an allotment in his own right; and thus, like many others, he had a personal allotment as well as an interest in inherited land.

Thereafter, in 1907, the county court of Hughes County, Oklahoma, regularly appointed John A. Jacobs guardian of the plaintiff's person and estate, he then being a minor and that being the county of his residence. In 1914 that court entered an order (1) reciting it was made after a hearing in the plaintiff's presence and at which he was examined; (2) finding he was then over the age of 21 years, but was incompetent to manage his own affairs and still in need of a guardian; (3) also finding Jacobs, the then guardian, was a proper person to be continued as such; (4) declining to accept a resignation tendered by Jacobs; and (5) ordering that the guardianship be continued and that thereafter Jacobs should act " as guard-

---

[1] The allotment in the right of the grandmother was made under § 28 of the act of 1901 which, after providing for the enrollment of all tribal citizens living on April 1, 1899, declares, " and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs . . . and be allotted and distributed to them accordingly."

ian for Noah Stewart, incompetent," and should " be governed by the laws relating thereto." [1a] Jacobs assented; and the subsequent proceedings were all entitled " In the Matter of the Guardianship of Noah Stewart, an Incompetent."

In May, 1916, the guardian by a verified petition requested the county court to authorize a sale of the plaintiff's interest in the inherited land for the purpose of securing money needed for his maintenance and support and for the improvement of his personal allotment. A month later the court entered an order reciting a hearing on that petition after lawful notice; finding the proposed sale was necessary for the purposes named; and directing the guardian to make the sale. Under that order the guardian made the sale at public auction to the highest bidder and reported it to the county court. July 11, 1916, the court entered an order (1) finding that due notice of the intended sale was given, that the sale was fairly conducted and legally made, and that the price was not disproportionate to the value of the property; (2) confirming and approving the sale; and (3) directing the guardian to execute a deed to the purchaser. The purchase price was paid to the guardian and he executed and delivered to the purchaser a deed, which was filed for record in the proper office July 12, 1916. The purchaser then entered into possession and he and his grantees remained in possession continuously thereafter. The defendants are the present claimants under the guardian's sale.

As part of the plaintiff's evidence it was stipulated that the Secretary of the Interior had never removed any restrictions on the alienation of the inherited land and that the same thing was true of the plaintiff's personal allot-

---

[1a] See *Mullen* v. *Glass*, 43 Okla. 549; 143 Pac. 679; *Yarhola* v. *Strough*, 64 Okla. 195; 166 Pac. 729; *Lytle* v. *Fulotka*, 106 Okla. 86; 233 Pac. 456; *Johnston* v. *Guy*, 165 Okla. 156; 25 P. (2d) 625.

ment. But the defendants, although joining in the stipulation,. objected that the facts stipulated were immaterial.

August 4, 1917, the county court after a hearing entered an order adjudging that the plaintiff had become competent and discharging the guardian. The present suit was begun April 11, 1928.

The Supreme Court of the State in applying the state statutes of limitation said [p. 532]:

" Under the provisions of Section 1444, O. S. 1931, no action for the recovery of any estate, sold by a guardian, can be maintained by the ward, unless it is commenced within three years next after the termination of the guardianship, or when a legal disability to sue exists by reason of minority or otherwise, at the time when the cause of action accrues, within three years next after the removal thereof. The plaintiff could have commenced his action at any time within three years after August 4, 1917. Under the provisions of Section 100, O. S. 1931, any person entitled to bring an action for the recovery of real property, who may be under any legal disability when the cause of action accrues, may bring his action within two years after the disability is removed. Under that statute the plaintiff could have brought his action within two years after August 4, 1917. Under the provisions of the second subdivision of Section 99, O. S. 1931, an action for the recovery of real property sold by a guardian, upon an order or judgment of a court directing such sale, brought by the ward or his guardian, must be brought within five years after the date of the recording of the deed made in pursuance of the sale. Under that statute the plaintiff could have brought his action within five years after the 12th day of July, 1916."

Under the state statutes thus described the court held that the plaintiff's asserted right to call in question the guardian's sale was barred before the suit was begun and

before the approval of the act of Congress of April 12, 1926.

1. Was the guardian's sale, as directed and approved by the county court, a forbidden alienation within the meaning of any then existing federal restriction? The plaintiff insists it was and points to the act of May 27, 1908, c. 199, 35 Stat. 312, as containing the restriction.

As a preliminary to considering that statute it will be helpful to refer to the conditions and legislation which preceded its enactment.

The Creek Tribe was one of the Five Civilized Tribes, each of which owned and occupied a tribal domain in the Indian Territory. Congress never provided a territorial government for that Territory, but ultimately did establish local courts therein and invested them with probate, as well as civil and criminal, jurisdiction. The laws for the Territory consisted largely of Arkansas statutes put in force therein by Congress; and these statutes included chapters providing comprehensively for the administration of estates of decedents, minors and incompetents, and for the sale of their property. At first the adopted Arkansas statutes were not intended to be fully applicable to Indians, but Congress soon made them applicable to all persons, " irrespective of race,"[2] and later on declared that the courts in the Territory should have " full and complete jurisdiction" of all " estates of decedents, guardianships of minors and incompetents, whether Indians, freedmen, or otherwise."[3]

November 16, 1907, the Territory of Oklahoma and the Indian Territory were admitted into the·Union as the State of Oklahoma under an enabling act passed by Congress June 16, 1906, c. 3335, 34 Stat. 267, and amended

[2]Act of June 7, 1897, c. 3, 30 Stat. 62, 83.
[3]Act of April 28, 1904, c. 1824, § 2, 33 Stat. 573.

March 4, 1907, c. 2911, 34 Stat. 1286. The enabling act and the constitution of the new State united in declaring that, with exceptions not material here, " all laws in force in the Territory of Oklahoma " at the time of the State's admission should be " in force throughout the State " and that the " courts of original jurisdiction of such State " should be the successors of " all courts of original jurisdiction of said Territories."

The laws of the Territory of Oklahoma which were thus put in force " throughout " the new State included comprehensive provisions for the administration of estates of decedents, the appointment of guardians of minors and incompetents, and the management and sale of their property. In the Territory of Oklahoma jurisdiction over these subjects was vested in probate courts and by the constitution of the new State that jurisdiction was committed to county courts.

The lands of the Creek Tribe were allotted among its enrolled members pursuant to the act of March 1, 1901, c. 676, 31 Stat. 861, as modified and supplemented by the acts of June 30, 1902, c. 1323, 32 Stat. 500, and March 3, 1905, c. 1479, 33 Stat. 1071. Under these acts lands allotted to living members in their own right were subjected to specified restrictions on alienation; but those allotted in the right of deceased members were left unrestricted.[4]

The act of April 26, 1906, c. 2876, 34 Stat. 137, substituted a system of revised restrictions made applicable to all of the Five Civilized Tribes. In § 19 it dealt with restrictions relating to lands of living allottees, and in § 22 with those relating to inherited lands, including, as this court has held, lands allotted in the right of deceased members.[5] Under § 22 the right of full-blood Indian heirs to alienate the inherited lands was subjected to the

---

[4] *Skelton* v. *Dill,* 235 U. S. 206; *Adkins* v. *Arnold,* 235 U. S. 417, 420; *Talley* v. *Burgess,* 246 U. S. 104, 107.

[5] *Talley* v. *Burgess, supra,* 108.

restriction that the conveyance be approved by the Secretary of the Interior.

The act of May 27, 1908, c. 199, 35 Stat. 312, again revised the restrictions and practically substituted its § 1 for § 19 of the act of 1906, and its § 9 for § 22 of that act. Thus, like the act of 1906, it dealt with the restrictions relating to lands of living allottees separately from those relating to inherited lands.

In § 1 the act of 1908, after declaring that certain lands of designated classes of allottees " shall be free from all restrictions," provides—

"All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe."

Counsel for the plaintiff place some reliance on that restriction. But there is no basis for doing so. The plaintiff's relation to the land in question was that of an heir, and not that of an allottee.[6] The land was allotted in the right of his deceased grandmother; so she rather than he should be regarded as the allottee.

Section 9 relates to the alienation of inherited lands. So far as is material here it provides:

" That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: *Provided,* That no con-

---

[6] *Harris* v. *Bell,* 254 U. S. 103, 108.

veyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

While this provision, if taken literally, might be regarded as confined to subsequent deaths and resulting heirships, a reading of the entire act, including its introductory sentence, shows that the purpose was to prescribe rules respecting future alienation by heirs—as well where they had become such before the act as where they might become such thereafter. The provision has been so applied by this Court.[7]

The first sentence in the quoted part of § 9, where not restrained by the proviso, undoubtedly frees the inherited lands from all restrictions on alienation. But as respects an heir who is a full-blood Indian the proviso obviously restrains that sentence and, if taken literally, makes unlawful any conveyance of any interest of such an heir in the inherited lands unless the conveyance be approved by the court having jurisdiction of the settlement of the estate of the deceased allottee. Here the heir was a full-blood Indian. So the question arises, whether the proviso is intended to include a conveyance made pursuant to a guardian's sale, such as was directed and approved by the county court in this instance.

The proviso makes no mention of minors or incompetents under guardianship or of conveyances made by their guardians under the direction of courts having jurisdiction of their estates. Under other acts of Congress the persons and estates of Indian minors and incompetents in the Indian Territory and the State of Oklahoma have long been subjected to the jurisdiction of local courts; and that jurisdiction is recognized throughout the allotment statutes before described and in § 2 of the act of 1908. True,

_____

[7] *Harris* v. *Bell*, 254 U. S. 103, 108, 114.

that jurisdiction could not be exercised otherwise than in keeping with the laws of Congress relating to such Indians and their lands; but this constitutes no reason for putting aside the statutes granting and recognizing the jurisdiction when a related statute is being examined and construed.

The court which would have jurisdiction of the settlement of the estate of the deceased allottee (plaintiff's grandmother) is either the same county court that directed and approved the guardian's sale or the county court in an adjoining county. So, the court named in the proviso and the one which directed and approved the guardian's sale were either identical or of the same rank.

A similar question respecting the construction and application of the proviso was considered by this court in 1920. The case involved a sale of inherited land by the guardian of minor heirs who were full-blood Creek Indians, the guardian having acted under the order of the court having control of the guardianship; and it was held that the proviso, rightly construed, did not include such a sale.

In that case the Court said:[8]

" If in this instance the same court had had jurisdiction of the guardianship of the minor heirs and of the settlement of the estate of the deceased allottee, no embarrassment would have ensued; but as that was not the case, the question arises, whether it was essential that the guardian's conveyance, directed and approved, as it was, by the court having control of the guardianship, should also be approved by the court having jurisdiction of the settlement of the deceased allottee's estate? The Circuit Court of Appeals answered in the negative; and, while the question is not free from difficulty, we think that solution of it is right.

---

[8] *Harris* v. *Bell*, 254 U. S. 103, 112–113.

414

" Of course, the purpose in requiring any approval is to safeguard the interests of the full-blood Indian heir. Where he is a minor he can convey only through a guardian, and no court is in a better situation to appreciate and safeguard his interests than the one wherein the guardianship is pending. Besides, as a general rule, a guardianship carries with it exclusive power to direct the guardian and to supervise the management and disposal of the ward's property. It is so in Oklahoma. This rule is so widely recognized and so well grounded in reason that a purpose to depart from it ought not to be assumed unless manifested by some very clear or explicit provision. . . . The proviso does not mention minors under guardianship; and to regard its general words as including them will either take all supervision of the sale of their interest in inherited lands from the court in which the guardianship is pending, or subject that court's action to the approval of another court of the same rank. In either event conflict and confusion will almost certainly ensue and be detrimental to the minor heirs. But, if the proviso be regarded, as well it may, as referring to heirs not under guardianship . . . all full-blood heirs will receive the measure of protection intended. We think this is the true construction."

In principle what was said there is applicable here. That the Indian heir in that case was a minor and in this was an incompetent is not material. The important thing, both there and here, is that the conveyance was made under the direction of the court having jurisdiction of a pending guardianship over the heir's estate. The guardianships were alike in point of congressional authorization and recognition, had like purposes, and were attended by like measures of control.

Plainly the proviso should be read in connection with the statutes whereby Congress authorized and recognized such guardianships and in the light of familiar rules of

construction. Upon such a reading it becomes reasonably certain that the proviso, although couched in general terms, is not intended to include a conveyance made by the guardian of a minor or incompetent heir pursuant to a sale directed and approved by the court having control of the guardianship of the heir's estate.

The review which we have made of the federal restrictions shows that the guardian's sale was not a forbidden alienation under any of them.

2. We come then to the contention respecting the application of the state statutes of limitation. It proceeds on the assumption first, that the guardian's sale was in direct conflict with the federal restrictions on alienation; and, secondly, that the proceedings whereby the plaintiff was brought under guardianship as an incompetent, as also the later proceedings leading to the sale, were not in conformity with the state statutes and that these irregularities brought the sale in conflict with the restrictions.

We have already shown that the first assumption is not tenable. And we are of opinion the second is illgrounded.

When Congress subjected Indian minors and incompetents and their estates to the laws of the State in respect of guardianships it did not thereby incorporate those laws into the federal restrictions. It merely gave its assent to their application to such Indians. The laws remained state laws, as before, and as such were to be applied to these Indians. Congress expressly imposed a limitation fixing stated ages of majority for them. This, of course, put that matter beyond the reach of the state statutes, and the courts of the State have so ruled. Apart from this limitation and some others not material here, the state laws have the same application to Indian guardianships that they have when the wards are minors or incompetents of other races.

Whether the proceedings in such Indian guardianships conform to the state statutes is a question of state, not federal, law. And, in the absence of congressional provision to the contrary, the time and mode of seeking the correction of errors believed to have been committed by the state courts in such proceedings, as also the effect of inaction in that regard, are all controlled by the state laws, as in the instance of other guardianship proceedings.

It follows from these considerations that, subject to a matter about to be considered, no federal statute or right was violated or infringed in applying the state statutes of limitation to this suit.

3. The remaining question is whether there was error in the ruling that the act of April 12, 1926, could not be given effect in this case without depriving the defendants of property contrary to the due process of law clause of the Constitution.

The defendants hold the rights transferred by the guardian's sale and deed. The deed was filed for record July 12, 1916, and the grantee then went into possession. The plaintiff had then attained his majority but was under guardianship as an incompetent. That disability and guardianship terminated August 4, 1917. The guardian's sale and deed were not challenged until April 11, 1928, when this suit was begun. In the meantime any right the plaintiff may have had to challenge the sale and deed had become barred by § 1444 and subdivision 2 of § 100 of the state statutes of limitation. The bar became effective July 12, 1921, if not August 4, 1920, in that under the operation of those statutes the guardian's sale and deed then ripened into an unassailable title.

Section 2 of the act of April 12, 1926, declares that— " No cause of action which heretofore shall have accrued to " any restricted Indian of any of the Five Civilized Tribes " shall be barred prior to the expiration of a

period of two years from and after the approval of this Act, even though the full statutory period of limitation shall already have run or shall expire during said two years' period, and any such restricted Indian, if competent to sue, or his guardian, or the United States in his behalf, may sue upon any such cause of action during such two years' period free from any bar of the statutes of limitations."

We are of opinion that so much of the section as purports to free from any bar of the statutes of limitation a cause of action such as is here presented, notwithstanding the full period of limitation had run prior to the act's approval, falls nothing short of an attempt arbitrarily to take property from one having a perfect title and to subject it to an extinguished claim of another.

As respects suits to recover real or personal property where the right of action has been barred by a statute of limitations and a later act has attempted to repeal or remove the bar after it became complete, the rule sustained by reason and preponderant authority is that the removing act cannot be given effect consistently with constitutional provisions forbidding a deprivation of property without due process of law.[9] " The reason is," as this Court has said, " that, by the law in existence before the repealing act, the property had become the defendant's. Both the legal title and the real ownership had become vested in him, and to give the act the effect of transferring this title to plaintiff, would be to deprive him of his property without due process of law." [10]

The state court so ruled in this suit and we sustain that ruling.

*Judgment affirmed.*

---

[9] Cooley Const. Lim., 6th ed., p. 448.
[10] *Campbell* v. *Holt*, 115 U. S. 620, 623.