**ECONOMIC DEVELOPMENT AND INDUSTRIAL CORPORATION OF BOSTON and Government Land Bank, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 78–1247–N.**

United States District Court, D. Massachusetts.

Sept. 8, 1982.

Daniel B. Bickford, Gaston Snow & Ely Bartlett, Boston, Mass., for Government Land Bank.

Barbara S. Gard, Douglas B. MacDonald, Boston, Mass., for Massachusetts Port Authority.

William E. Hill, Dept. of Justice, Land & Natural Resource Div., Washington, D.C., for USA & GSA.

## ORDER AND MEMORANDUM OF DECISION

DAVID S. NELSON, District Judge.

At issue in the present action is the title to a 2.18-acre parcel of land, known as "Parcel 2," which comprises a portion of what was once the South Boston Naval Annex and what has since become the Boston Marine Industrial Park. In order to permit the enlargement of the Navy's dry dock facilities, the Commonwealth in 1941 granted title to and ceded exclusive jurisdiction over this property to the United States, but with the express reservation that both title and exclusive jurisdiction would revert to the Commonwealth "whenever said areas shall cease to be used for naval purposes." In November 1975, this contingency occurred. As a result, the plaintiffs, which are the statutory successors-in-interest to the Commonwealth, contend that title to Parcel 2 was revested in them under the terms of the original grant. The United States, however, argues that the Commonwealth forfeited its possibility of reverter upon failure to comply with a 1956 recording statute. Both sides have moved for summary judgment upon a stipulated set of facts.

### I.

Resolution of this dispute hinges upon the interpretation, and the legal validity, of four Massachusetts statutes. The first has generated no disagreement. In accordance with the terms of U.S.Const., Art. I, § 8, cl.

Stephen Carr Anderson, Rackemann, Sawyer & Brewster, Boston, Mass., for Economic Development & Indus. Corp. of Boston.

**1206**

17,[1] and with an emergency preamble,[2] the 1941 Granting Act granted title to and ceded exclusive jurisdiction over Parcel 2 (and other designated properties) to the United States subject to three conditions. Mass.St. 1941, c. 535. First, the Commonwealth reserved the right to serve civil and criminal process within the ceded property for offenses committed and taxes incurred elsewhere. Second, as mandated generally by the provisions of 40 U.S.C. § 255 (1970), exclusive jurisdiction would vest in the United States only after an agent designated by the Secretary of Navy had filed with the Secretary of State of the Commonwealth a copy of the plan of Parcel 2 authenticated by signature and certification of authority. Finally, the act provided that "the title to, and the exclusive jurisdiction over, said areas shall revert to and revest in the commonwealth whenever said areas shall cease to be used for naval purposes."[3] The Commandant of the Boston Navy Yard accepted jurisdiction of the ceded property by letter to the Secretary of the Commonwealth dated October 14, 1941.

Some fifteen years later, the Commonwealth enacted a statute entitled "An Act Protecting Title to Land against Certain Rights of Entry and Possibilities of Reverter and Limiting the Bringing of Proceedings to Enforce Such Rights." Mass.St. 1956, c. 258. Section two of this act amended chapter 260 of the Massachusetts General Laws by inserting section 31A, which provided in pertinent part as follows: "No proceeding based upon any . . . possibility of reverter . . . created before [January 2, 1955] shall be maintained either at law or in equity in any court after [January 1, 1966],[4] unless on or before" that date the holder of the reversionary interest had filed a written notice and description of his claim in the registry of deeds. The act further stated that "[t]his section shall apply to all such rights whether or not the owner thereof is . . . a government or governmental subdivision . . . ." The parties have stipulated that neither the Commonwealth nor any officer, instrumentality, or agency thereof has ever recorded notice of the possibility of reverter in Parcel 2 created by the 1941 Granting Act.

Two subsequent amendments to the Recording Act, both of direct relevance to the instant dispute, complete the pertinent statutory background. Mass.St.1968, c. 496 explicitly excluded the Commonwealth from the operation of the statute by inserting the following underscored language: "This section shall apply to all such rights whether or not the owner thereof is . . . a government or governmental subdivision *other than the commonwealth* . . . ." Finally, perceiving a need for even greater clarity, the legislature in 1974 enacted clarifying legislation "to immediately . . . fix with certainty our intent with respect to the applicability of certain of our statutes to the commonwealth." Mass.St.1974, c. 527.

1. This provision states in relevant part:
 The Congress shall have power . . . To exercise exclusive Legislation in all Cases whatsoever [over the District of Columbia] and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . . U.S.Const., Art. I, § 8, cl. 17.

2. The preamble defined the purpose of the act as "provid[ing] land for the immediate extension of the navy dry dock property in Boston harbor for the purposes of national defense."

3. Such reservations, to which the United States has interposed no objection, are consistent with a grant of exclusive jurisdiction under U.S.Const., Art. I, § 8, cl. 17. *E.g.*, *Paul v. United States*, 371 U.S. 245, 265, 83 S.Ct. 426, 438, 9 L.Ed.2d 292 (1963) ("[A] state may condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use"). In *James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), the Court upheld a donative statute specifically reserving to the state a possibility of reverter that would arise should the United States "for five consecutive years fail to use any such land for the purposes of the grant." *Id.* at 143 n. 4, 58 S.Ct. at 213 n. 4.

4. By Mass.St.1961, c. 448, § 5, the cut-off date for recording such notice under G.L. c. 260, § 31A was changed from January 1, 1966 to January 1, 1964.

In a "statement of legislative purpose," the statute indicated as follows:

> The general court notes that the insertion in the General Laws of [G.L. c. 260, § 31A] ... [has], contrary to the legislative intent thereof, created the misapprehension that [it] applied to lands owned and conveyed by the commonwealth subject to certain limitations. The general court further notes that, despite the longstanding canon of statutory construction that a procedural statute has retrospective as well as prospective effect, some misapprehension exists as to the proper construction of said section thirty-one A, as amended [in 1968]. In order that the original intent of the legislature might now be clarified and the inapplicability of the above mentioned statutes to commonwealth grants and conveyances might be fixed with certainty, the general court deems it necessary and in the public interest to enact this clarifying legislation.

The statute went on to provide in sections four and six as follows:

> The provisions of [G.L. c. 260, § 31A], as most recently amended [in 1968], shall not be construed to apply to, and do not apply to, reversionary interests upon fee simple determinables or fee simples subject to the right of entry or condition broken of the commonwealth, whether created before or after the effective date of the passage of this act, in lands owned and conveyed by the commonwealth, notwithstanding any lapse of time or the passage of any prior law.
>
> . . . .
>
> This act shall be retrospective as well as prospective in its application, applying to all grants by the commonwealth whether created before or after its effective date.

Mass.St.1974, c. 527.

As noted above, the United States ceased using Parcel 2 for naval purposes in November 1975, some sixteen months after the enactment of this clarifying legislation. During this time, the federal government engaged in the process of "surplusing" the South Boston Naval Annex as excess real property, in accordance with 40 U.S.C. § 484 (1970). By deed dated June 14, 1977, the United States conveyed its interest in the annex, including Parcel 2, to the plaintiff Government Land Bank for a consideration of $4,290,000.[5] The Land Bank immediately reconveyed its interest in the property to the plaintiff Economic Development and Industrial Corporation,[6] subject to a mortgage securing a loan from the Land Bank to EDIC for the full purchase price. In reflection of the dispute surrounding title to Parcel 2, the agreed-upon value of that parcel—$1,587,300—was deducted from the purchase price and placed in an escrow account pending adjudication of this issue.[7]

## II.

The plaintiffs advance three principal contentions in their effort to elude the strictures of the Recording Act. First, they argue that the Commonwealth was under no duty to record its possibility of reverter because post-cession enactments of the ceding jurisdiction have no application within the ceded enclave absent express adoption by Congress. Second, the Recording Act, by its original terms and as reinforced by the 1974 expression of legislative intent, is said to have been inapplicable to all rever-

---

5. The Government Land Bank is a state instrumentality, created by Mass.St.1975, c. 212, authorized to finance the acquisition of certain surplused federal military installations.

6. The Economic Development and Industrial Corporation, created by Mass.St.1971, c. 1097, was formed to spur economic development in Boston.

7. The Massachusetts Port Authority was named a defendant in the present action because of its claim that under Massachusetts law it, rather than the plaintiffs, had succeeded to the interest of the Commonwealth in Parcel 2. This family quarrel was settled during the regrettable length of time that the parties were awaiting a decision by the court, and the claim against the Port Authority has been dismissed.

**1208**

sionary interests of the Commonwealth. And finally, even if the act was initially applicable, it is argued that the 1968 exclusion of the Commonwealth, expressly made retroactive in 1974, effected a valid revival of the Commonwealth's interest before any right to enforce that interest had accrued.[8]

 The first issue has created the anomalous situation in which the state instrumentalities seek to maximize the scope of the federal government's exclusive jurisdiction over enclaves, particularly the preclusive effect of that jurisdiction on state legislation, while the United States seeks to downplay its powers in this regard. It has long been established that, when the United States has accepted exclusive jurisdiction over territory pursuant to U.S.Const., Art. I, § 8, cl. 17, all state law in effect on the date of cession and not inconsistent with federal use of the property is assimilated as federal law within the enclave, but that subsequent state enactments have no application therein unless adopted by Congress.[9] *E.g., United States v. State Tax Comm.,* 412 U.S. 363, 369–73, 93 S.Ct. 2183, 2188, 37 L.Ed.2d 1 (1973); *Paul v. United States,* 371 U.S. 245, 263, 268, 83 S.Ct. 426, 437, 439, 9

L.Ed.2d 292 (1963); *Pacific Coast Dairy, Inc. v. Dep't of Agric.,* 318 U.S. 285, 294, 63 S.Ct. 628, 630, 87 L.Ed. 761 (1943); *Stewart & Co. v. Sadrakula,* 309 U.S. 94, 100, 60 S.Ct. 431, 434, 84 L.Ed. 596 (1940). Invoking these rules, courts have dismissed as inapplicable to federal enclaves a host of state laws regulating everything from the price of milk, *Pacific Coast Dairy, Inc. v. Dep't of Agric.,* 318 U.S. at 295, 63 S.Ct. at 630, to workmen's compensation. *Employers' Liab. Assur. Corp. v. DiLeo,* 298 Mass. 401, 10 N.E.2d 251 (1937).[10] The plaintiffs assert that the regulatory scheme imposed by the Recording Act, with its attendant alteration of substantive rights in land, similarly must be deemed inapplicable to the Commonwealth's possibility of reverter in a federal enclave created fifteen years earlier.

The United States' argument to the contrary relies primarily upon *Howard v. Comm'rs of Sinking Fund,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). There, the city of Louisville, Kentucky had attempted, first, to annex federal lands on which a naval ordnance plant—described by the Court as an Article I enclave—was located and then to impose an occupational tax on

8. The plaintiffs also have advanced the following additional arguments: (1) that the 1941 cession was an intersovereign compact under U.S.Const., Art. I, § 10, cl. 3, the terms of which cannot subsequently be abrogated without mutual agreement nor waived by one party without a clear intention to do so; (2) that the United States, having notice of the Commonwealth's reverter, is not among the Recording Act's intended beneficiaries and cannot claim its protection; (3) that any finding in favor of the United States would contravene the Massachusetts rule that land appropriated to one public use cannot be diverted to another, inconsistent use without express legislative declaration; and (4) that the Commonwealth's reverter is protected from forfeiture by an act of Congress under the tenth amendment.

9. A state can condition its consent by reserving jurisdiction over the ceded area consistent with the federal use. *E.g., Paul v. United States,* 371 U.S. 245, 264–65, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963); *Stewart & Co. v. Sadrakula,* 309 U.S. 94, 99–100, 60 S.Ct. 431, 433, 84 L.Ed. 596 (1940); *James v. Dravo Contracting Co.,* 302 U.S. 134, 147–48, 58 S.Ct. 208, 215, 82 L.Ed.

155 (1937); *see also Fort Leavenworth RR Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). As noted above, however, none of the three conditions contained in the 1941 Granting Act empowered the Commonwealth to require the recording of title to property within the enclave.

10. *See generally* Interdepartmental Committee for the Study of Jurisdiction over Federal Areas Within the States, *Jurisdiction over Federal Areas Within the States, Part I: The Facts and Committee Recommendations* (1956); *id. Part II: A Text of the Law of Legislative Jurisdiction* (1957); P. Twitty, *The Respective Powers of the Federal and Local Governments Within Lands Owned or Occupied by the United States* (1944); Engdahl, *State and Federal Power over Federal Property,* 18 Ariz.L.Rev. 283 (1976); Note, *Federal Areas: The Confusion of a Jurisdictional-Geographical Dichotomy,* 101 U.Pa.L. Rev. 124 (1952); Note, *Land Under Exclusive Federal Jurisdiction: An Island Within a State,* 58 Yale L.J. 1402 (1949).

the plant's employees. A federal statute specifically authorized such municipal taxes, but the city tax applied only to persons working within the city limits. Consequently, the validity of the tax depended on the propriety of the annexation of the ordnance plant. The Court upheld the city's action, stating:

A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States.... A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government.... It is friction, not fiction, to which we must give heed.

*Id.* at 626–27, 73 S.Ct. at 466. Plaintiffs argue that the *Howard* decision must be read narrowly "in the light of more recent decisions of the Supreme Court addressing exclusivity without reference to that case." [11] *Reply Brief* 18. Yet *Howard*'s rejection of the "fiction of a state within a state" was specifically upheld in *Evans v. Cornman,* 398 U.S. 419, 421–22, 90 S.Ct. 1752, 1754, 26 L.Ed.2d 370 (1970). There,

Maryland had sought to deny enclave residents the right to vote in state elections, on the grounds that they were not Maryland residents and were unaffected by electoral decisions. Citing *Howard* to reject the notion of nonresidency in the state, and brushing aside early cases to the contrary by noting that "the relationship between federal enclaves and the State in which they are located has changed considerably," *id.* at 423, 90 S.Ct. at 1755, the Court struck down the state's action on equal protection grounds.

The *Howard* and *Evans* decisions effectively repudiated the traditional notion of extraterritoriality of federal enclaves, a notion which viewed the exclusive legislative power as "in essence complete sovereignty." *S.R.A. Inc. v. Minnesota,* 327 U.S. 558, 562, 66 S.Ct. 749, 752, 90 L.Ed. 851 (1946).[12] Yet the full implications of this repudiation have yet to be addressed by the appellate courts.[13] The United States here appears to endorse a rule that would bar enforcement only of those state laws which, as applied, interfere with the conduct of ongoing federal activities within the enclave. One commentator has forcefully argued that the recent cases, taken to their logical extreme, would permit the extension of state governmental jurisdiction in its full scope over federal enclaves, subject only to displacement by federal law—a view that would redefine the "exclusive Legislation" clause as conferring, not an exclusive power to legislate, but rather a power to legislate

---

**11.** The plaintiffs also attempt to distinguish *Howard* by emphasizing that the United States had specifically authorized the occupational tax. They ignore the propriety of the annexation itself, concerning which no federal authorization existed.

**12.** Justice Story had earlier framed this theory in even more striking fashion, describing a federal enclave in Rhode Island as follows: "Strictly speaking, it was not within the body of any county of Rhode Island, for the state had no jurisdiction there. It was as to the state as much a foreign territory, as if it had been occupied by a foreign sovereign." *United States v. Cornell,* 25 F.Cas. 650, 653 (No. 14,-868) (C.C.D.R.I.1805).

**13.** Several appellate courts have applied the *Howard* case broadly. *See, e.g., United States v. Bellevue,* 474 F.2d 473, 474–75 (8th Cir. 1973); *First Hardin Nat'l Bank v. Fort Knox Nat'l Bank,* 361 F.2d 276, 278–79 (6th Cir. 1966); *Bartsch v. Wash. Metrop. Area Transit Comm.,* 357 F.2d 923, 924 (4th Cir. 1966); *Board of County Comm'rs v. Donoho,* 144 Colo. 321, 356 P.2d 267 (1960). In *United States v. McGee,* 432 F.Supp. 557 (S.D.Ohio 1977), cited by the plaintiffs, the court enjoined an attempted annexation by a municipality of an air force base, not because the law was deemed automatically inapplicable, but because of a "potential for friction" and a "danger of interference." *Id.* at 561.

exclusively whenever appropriate.[14] Engdahl, *State and Federal Power over Federal Property,* 18 Ariz.L.Rev. 283, 288–90, 332–36, 376–82 (1976).[15] But this court need not travel that distance in order to reject the plaintiffs' argument.

Although the plaintiffs aptly characterize the Recording Act as imposing a regulatory scheme effecting a "major change in property rights and obligations," *Brief* 11, the present dispute involves matters considerably less earthshaking. We are not faced with an attempt to apply the act to the United States itself, or even to private property owners residing within an enclave. At issue is simply the act's applicability to the Commonwealth's possibility of reverter in the enclave property. It cannot be gainsaid that requiring the Commonwealth to record this interest would have posed no friction or interference with the federal government's use of the naval annex. Compliance by the Commonwealth would have preserved the status quo; noncompliance would have extinguished its reverter— an event that hardly could be termed disruptive from the United States' standpoint. Indeed, the fact that only future title to the property is involved, and then only when the enclave has ceased being used for naval purposes, renders this a stronger case for enforcement of the state law than *Howard,* where current municipal boundaries were rearranged. Given the utter lack of friction here, plaintiffs are relegated to insisting upon adherence to the traditional rule barring application per se of all post-cession state laws absent congressional action. The

*Howard* and *Evans* decisions clearly poked a small hole through this armor which—whatever its ultimate shape might be—is presently large enough to permit this case to slip through.

### III.

■ The second issue, which neither side has argued with much enthusiasm, is whether the Recording Act as originally enacted applied to the Commonwealth. As noted above, up until the 1968 insertion of the words "other than the commonwealth," the statute provided: "This section shall apply to all such rights whether or not the owner thereof is a corporation or a charity *or a government or governmental subdivision* . . . ." Mass. G.L. c. 260, § 31A (emphasis added). The United States contends that this language is plain and unambiguous, such that resort to extraneous aids of statutory interpretation is precluded under Massachusetts law.[16] Although the court does not regard this provision as so clearcut as to obviate the need for further inquiry, it agrees that the language is strongly supportive of the United States' position. Indeed, the Supreme Judicial Court, although without intending its remark to be "dispositive of the result," has stated: "On its face, this language would appear to include the Commonwealth." *Boston Waterfront Dev. Corp. v. Commonwealth,* 378 Mass. 629, 651, 652, 393 N.E.2d 356 (1979). Absent compelling evidence to the contrary, therefore, this court will abide by that interpretation.

The plaintiffs have cited no case in which a statutory reference to "government" has

---

**14.** The plaintiffs contend that any approach focusing upon a potential for "friction" would read the "exclusive Legislation" clause out of the Constitution and leave Article I properties no greater independence than that afforded to any federal property under Article IV, Section 3 and the supremacy clause. This objection is without merit. The United States' power over Article IV property is confined to its enumerated powers and the necessary and proper clause. *See, e.g., Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). But even under a narrow interpretation of Article I, the authority to exercise "exclusive Legis-

lation in all Cases whatsoever" would still permit the exercise over enclaves of whatever police and other governmental powers, otherwise reserved to the states, are deemed expedient.

**15.** See also D. Engdahl, *Constitutional Power: Federal and State in a Nutshell* c. 8 (1974).

**16.** *See, e.g., Hoffman v. Howmedica, Inc.,* 373 Mass. 32, 37, 364 N.E.2d 1215 (1977); *Mass. Mutual Life Ins. Co. v. Comm'r of Corps. and Taxation,* 363 Mass. 685, 690, 296 N.E.2d 805 (1973).

been construed to exclude the Commonwealth. Instead, they rely on the proposition that statutes of limitations will not apply to the Commonwealth without its explicit consent to be bound. Although this accurately reflects Massachusetts law, *see, e.g., Attorney General v. Trustees of Boston Elev. Ry. Co.,* 319 Mass. 624, 667, 67 N.E.2d 676 (1946); *see also* Mass. G.L. c. 260, § 18, it adds little to the present inquiry. First, it begs the question whether the reference to "government" in section 31A might constitute such consent. Second, although the Recording Act has been characterized as "in effect a statute of limitations," *Opinion of the Justices,* —— Mass. ——, ——, 1981 Mass. Adv.Sh. 1361, 1371, 424 N.E.2d 1092,[17] it plainly is distinct in several respects.[18] Unlike a typical statute of limitations, for example, the act (1) cuts off interests because of failure to file notice rather than failure to bring suit; (2) is not limited in effect to presently assertable causes of action; (3) prescribes no time limit in which existing causes of action must be asserted; and (4) does not toll the filing requirement for persons under a disability.[19] The Recording Act would appear equally analogous to those statutes limiting the duration of various restrictions on land. *See* Mass. G.L. c. 184, § 23 (thirty-year limit on conditions or restrictions "unlimited as to time"); *id.* c. 184A, § 3 (thirty-year limit on specified future interests). The Commonwealth has been explicitly *excluded* from the operation of these statutes.[20]

Nor can the court discern any pattern in these and other statutes governing restric-

tions on land that compels the exemption of the Commonwealth from the Recording Act's obligations. Contrary to plaintiffs' suggestion, the fact that the legislature has dealt with actions to recover land by the Commonwealth in a separate statute, Mass. G.L. c. 260, § 31 (twenty-year limit following accrual of right), does not indicate that the Commonwealth's rights and obligations regarding land are always addressed separately. The felt need to explicitly exclude the Commonwealth from the two statutes just adverted to counsels otherwise. In a House Report accompanying the 1974 amendment to the Recording Act, it is argued that one of these statutes—G.L. c. 184, § 23, which as noted explicitly exempts the Commonwealth from the thirty-year limit on conditions or restrictions on land unlimited as to time—"clearly controls any construction of G.L. c. 260, § 31A with respect to the commonwealth." *Report of the Committee on the Judiciary Relative to the Legislative Intent of the Accompanying Legislation,* 1974 House Doc. No. 6215, at 4–5. Had section 31A been intended to apply to the Commonwealth, it is said, chapter 184, section 23 would have been amended accordingly. *Id.* at 3. Even assuming, however, that the "conditions or restrictions" covered by section 23 include possibilities of reverter, the court can perceive no discrepancy between the Commonwealth's exclusion from that provision and its inclusion in section 31A. The former applies only to restrictions "unlimited as to time" and extinguishes all such restrictions after thirty years. *See* Goldstein, *Rights of*

**17.** *Accord, Selectmen of Nahant v. United States,* 293 F.Supp. 1076, 1078 (D.Mass.1968) (c. 260, § 31A "is a statute of limitations"); *Boston Waterfront Dev. Corp. v. Commonwealth,* 378 Mass. at 651, 393 N.E.2d 356 ("basically a statute of limitations"); *Opinion of the Justices,* 369 Mass. 979, 987, 338 N.E.2d 806 (1975) ("operates as a statute of limitations").

**18.** *See Town of Brookline v. Carey,* 355 Mass. 424, 426, 245 N.E.2d 446 (1969) ("Section 31A contains elements of both a statute of limitations and a recording statute").

**19.** *Cf.* P. Basye, *Clearing Land Titles* 372, 387, 396, 408, 414 (1970); L. Simes & C. Taylor, *The*

*Improvement of Conveyancing by Legislation* 4 (1960); Aigler, *Clearance of Land Titles—A Statutory Step,* 44 Mich.L.Rev. 45, 55 (1945). These authorities discuss the so-called "marketable title acts," which, although broader in scope, provided models for the Recording Act. *See* Wolfe & Johnson, *Rights of Entry and Possibilities of Reverter,* 39 Mass. L.Q. No. 4, at 23 (1954). *See also* text accompanying notes 22–23 *infra.*

**20.** Mass.St.1961, c. 448, § 2 deleted the Commonwealth's exclusion from c. 184A, § 3.

*Entry and Possibilities of Reverter as Devices to Restrict the Use of Land,* 54 Harv. L.Rev. 248, 254–55 (1940). The Recording Act covers "any" possibility of reverter and extinguishes only those not recorded within eight years. Excluding the Commonwealth from the act, moreover, would obviously undermine the statutory goals of facilitating title searches and improving the marketability of land. *See generally Town of Brookline v. Carey,* 355 Mass. 424, 427, 245 N.E.2d 446 (1969). The House Report also echoes plaintiffs' argument by stating that "where we intend that the commonwealth itself be subject to a certain requirement, that intent is unmistakeably evidenced by the use of the word 'commonwealth.' " 1974 House Doc. No. 6215, at 5. Again, the specific exemption of the Commonwealth from the very statute relied on by the House Report belies this suggestion. *See also Commonwealth v. Boston & Maine RR.,* 57 Mass. (3 Cush.) 25, 45 (1849) ("where general rights are declared, and remedies given [by statute], they include the commonwealth, though not named").[21]

Also worthy of note is the fact that the drafters of the Recording Act employed in part as "models" the so-called "marketable title acts" of nine midwestern states.[22] These addressed much broader categories of property claims but imposed a recording requirement similar in form to that in-

volved here. Of these nine statutes as then written, three applied to property interests of the state, either explicitly or by a general reference to "governmental" claimants. All six of the statutes that excluded the state government did so by the use of explicit language to that effect.[23] In light of this background, the drafters' reference to "government or governmental subdivision" and their failure specifically to exclude the Commonwealth acquire further significance.

The weight to be accorded a subsequent legislative declaration concerning the intent of an earlier statute varies in accordance with such factors as the extent of ambiguity in the original enactment and the length of intervening time.[24] As noted above, the language of the Recording Act is not woefully obscure. Also noteworthy is the somewhat contradictory nature of the 1974 legislative pronouncements, in which it was declared both that the Recording Act should be construed as originally inapplicable to the Commonwealth and that the 1968 exclusion of the Commonwealth from the act's coverage should be given retroactive effect. In light of these and the foregoing considerations, this court declines to accede to the legislature's directive concerning the correct meaning of a statute enacted sixteen years earlier and concludes that the Commonwealth was subject to the Recording Act as originally written.

---

**21.** The Report also suggests that use of the word "person" in section 31A evidences an intention to exclude the Commonwealth; that term, it is argued, is a word of art defined in Mass. G.L. c. 4, § 7, cl. 23 as follows: " 'Person' or 'whoever' shall include corporations, societies, associations and partnerships." However, the inclusion within section 31A of "a government or governmental subdivision" clearly negates any legislative intent to confine the act's coverage to the parameters of this definition.

**22.** Wolfe & Johnson, *Rights of Entry and Possibilities of Reverter,* 39 Mass. L.Q. No. 4, at 23 (1954). The nine states were Iowa, Illinois, Indiana, Wisconsin, Minnesota, Michigan, South Dakota, Nebraska and North Dakota.

**23.** Each of these marketable title acts is quoted and discussed in P. Basye, *Clearing Land Titles* c. 9 (1970).

**24.** *Compare, e.g., Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (views of subsequent Congress entitled to "significant" or "great" weight) *with United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968); *Rainwater v. United States,* 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958) (subsequent views accorded "very little, if any, significance"); *Mass. Comm. Against Discrimination v. Liberty Mutual Ins. Co.,* 371 Mass. 186, 193–94, 356 N.E.2d 236 (1976) ("no persuasive significance").

## IV.

█ Plaintiffs' final principal contention—that the 1968 and 1974 amendments effected a valid revival of the Commonwealth's possibility of reverter—appears more meritorious. Although the act in its overall design is distinct from a traditional statute of limitations in various respects, *see* text accompanying notes 17–19 *supra,* the sanction imposed for failure to record clearly takes the form of one by declaring: "No proceeding . . . shall be maintained in any court . . . ." *See* cases cited in note 17 *supra; see generally Goodwin Bros. Leasing, Inc. v. Nousis,* 373 Mass. 169, 173, 366 N.E.2d 38 (1977). It is well-established that, subject to constitutional and other [25] restrictions, a legislature can enlarge or otherwise amend a limitations period so as retroactively to revive a lost cause of action. *E.g., International Union of Elec., Radio & Machine Workers Local 790 v. Robbins & Myers, Inc.,* 429 U.S. 229, 243–44, 97 S.Ct. 441, 450, 50 L.Ed.2d 427 (1976); *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 315–16, 65 S.Ct. 1137, 1142, 89 L.Ed.2d 1628 (1945); *Campbell v. Holt,* 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885).[26] This proposition would appear to control the instant case.

█ The United States contends that the Commonwealth's noncompliance with the act effected a merger of the two estates and irrevocably extinguished not only its remedy but its right as well. The statutory language and legislative history would appear to belie this contention.[27] But the court need not determine the viability of this proffered interpretation. Even if correct, the Commonwealth would not be precluded, absent constitutional constraint, from reinstating its reverter by statutory amendment.

The United States has not cited to, nor can the court discern, any constitutional impediment to retroactive application of the Recording Act amendments, however that

**25.** A statute cannot revive a barred cause of action where the time for prosecuting it was fixed by contract, *e.g., Home Ins. Co. v. Dick,* 281 U.S. 397, 408–09, 50 S.Ct. 338, 341, 74 L.Ed. 926 (1930); *Mulligan v. Hilton,* 305 Mass. 5, 10, 24 N.E.2d 676 (1940), or where a statute creating a right also imposes a limitations period compliance with which constitutes a condition precedent to that right's existence. *E.g., William Danzer & Co., Inc. v. Gulf & Ship Island RR Co.,* 268 U.S. 633, 637, 45 S.Ct. 612, 613, 69 L.Ed. 1126 (1925); *Melnik v. Perwak,* 295 Mass. 512, 514, 4 N.E.2d 329 (1936).

**26.** In concluding that "certainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is *per se* an offense against the Fourteenth Amendment," 325 U.S. at 316, 65 S.Ct. at 1143, the *Chase Securities* Court eschewed the traditional "right-remedy" underpinnings of this rule as a "rather unsatisfactory rationalization." *Id.* at 314, 65 S.Ct. at 1142. The Court's more flexible approach has, in a broader context, been formulated as follows: "[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *accord, Porter v. Clerk of Superior Court,* 368 Mass. 116, 118, 330 N.E.2d 206 (1975).

**27.** *See* Wolfe & Johnson, *Rights of Entry and Possibilities of Reverter,* 39 Mass. L.Q. No. 4, at 22 (1954), in which the drafters of the Recording Act state:

> The obvious constitutional problem involved in attempting to abolish existing rights of entry was mentioned, and it was suggested that the solution might be to go after the *remedy* and leave the right alone; in other words, to impose, as a condition precedent to any action to enforce a right of entry, or rights under a possibility of reverter, the requirement that some notice or claim be recorded from time to time in the registry of deeds.

*Id.* at 22–23. It is also noteworthy that the courts in *Selectmen of Town of Nahant v. United States,* 293 F.Supp. 1076, 1078 (D.Mass. 1978), and *Town of Brookline v. Carey,* 355 Mass. at 448, 245 N.E.2d 446, although not addressing the 1968 and 1974 amendments specifically, upheld the constitutionality of the Recording Act on the basis of traditional statute-of-limitations principles. *But cf.* P. Basye, *Clearing Land Titles* c. 9, at 372 (1970) (those marketable title acts couched in terms of statutes of limitations "leave to implication the extinction of the claims of interests which the statutes affect").

act is construed. Were private parties involved here, a different result might obtain. In *Stewart v. Keyes,* 295 U.S. 403, 55 S.Ct. 807, 79 L.Ed. 1507 (1935), the Court stated:

> As respects suits to recover real or personal property where the right of action has been barred by a statute of limitations and a later act has attempted to repeal or remove the bar after it became complete, the rule sustained by reason and preponderant authority is that the removing act cannot be given effect consistently with constitutional provisions forbidding a deprivation of property without due process of law.

*Id.* at 417, 55 S.Ct. at 813. This proposition stems from *Campbell v. Holt,* in which the Court specifically exempted suits "to recover possession of real or personal property" from its endorsement of statutes reviving lost causes of action.[28] 115 U.S. at 622, 6 S.Ct. at 210. Were the Recording Act to be construed, as the United States proposes, such that failure to record invests the present-interest holder with absolute title, any attempt to revive the Commonwealth's interest against a private party would run afoul of the fourteenth amendment. Yet this proposition provides no refuge for the United States since the protections of that amendment do not extend to the federal government. *E.g., United States v. City of Jackson,* 318 F.2d 1, 8 (5th Cir. 1963). Nor does the state's action contravene the contract or supremacy clause of the constitution. The amendments operate simply to reestablish the original agreement between the sovereigns, not to impair that "contract" in any way. And a supremacy clause issue would arise only if, for example, the United States had received absolute title under the statute and then, prior to the amendments, had conveyed the property to a third party pursuant to some congressional authorization.

Finally, the court notes that retroactively exempting the Commonwealth from the act's provisions results in no injustice against the United States. Such action, as just mentioned, restores the parties' original understanding. The United States obviously had notice of the Commonwealth's possibility of reverter. The amendments were enacted before the reverter materialized. And the United States took no action in reliance upon the Commonwealth's failure to record its interest; indeed, the Department of Navy's disposal report, dated August 31, 1973, manifests a belief that the Commonwealth's reverter was still valid. These factors reinforce the court's conclusion that the Commonwealth regained title to Parcel 2 pursuant to its possibility of reverter.

Plaintiffs' motion for summary judgment is *Allowed.*

Defendant's cross-motion for summary judgment is *Denied.*

---

**28.** In *Chase Securities Corp. v. Donaldson,* 325 U.S. at 315–16, 65 S.Ct. at 1142, the Court affirmed the general holding in *Campbell* concerning revival of nonproperty-related suits.