ECONOMIC DEVELOPMENT AND IN-
DUSTRIAL CORPORATION OF BOS-
TON and Government Land Bank,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 280–78.

United States Claims Court.

Oct. 21, 1987.

Raymond J. Brassard, Boston, Mass., for plaintiff, Economic Development and Indus. Corp.

Daniel B. Bickford, Boston, Mass., for plaintiff, Government Land Bank.

Harry Kelso, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant.

## ORDER UPON RECONSIDERATION

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for summary judgment and plaintiffs' motion for partial summary judgment. The parties wish the court to determine whether legal title to land at the former South Boston Naval Shipyard Annex, Massachusetts, can be challenged judicially by the Commonwealth of Massachusetts and, if so, whether the United States has taken the land by inverse condemnation. Plaintiffs' position is that the United States took the land without just compensation in violation of the just compensation clause of the Fifth Amendment to the Constitution of the United States. Defendant argued that by operation of Massachusetts law plaintiffs lost their right to enforce any

interest they have, or ever had, in the land. Defendant also asserts the court is without jurisdiction to adjudicate the matter, the action was filed out of time, a taking was not claimed, and the facts belie plaintiffs' position that defendant is without the absolute right to continue to maintain exclusive jurisdiction over, and possession of, at the very least, 2.18 acres of the land in question.

## FACTS

In 1941, in recognition that the United States was rapidly becoming deeply involved in what would eventually be known as World War II, the legislature of the Commonwealth of Massachusetts ceded title to and exclusive jurisdiction over a parcel of land to the United States for use as a naval facility. 1941 Mass.Acts 535. The Emergency Preamble of the legislative grant stated that the purpose of the Act was to provide "land for the immediate extension of the navy dry dock property in Boston harbor. . . ." The key phrase of the grant, for purposes of this suit, is found in section 2 which stated that title to and exclusive jurisdiction over the land would revert to the commonwealth "whenever said areas shall cease to be used for naval purposes." The parcel of land in question consists of 67 acres and is identified as Parcel 2. Parcel 2 is comprised of 64.82 acres which is admittedly not used for naval purposes and 2.18 acres and certain easements over the 64.82 acres that defendant contends has been used for naval purposes from 1941 to date.

On April 10, 1956, the Commonwealth enacted legislation entitled "An Act Protecting Title to Land Against Certain Rights of Entry and Possibilities of Reverter and Limiting the Bringing of Proceedings to Enforce Such Rights." 1956 Mass. Acts 258 (the 1956 Limiting Act).[1] That

---

**1.** The purpose of the 1956 Limiting Act was to prevent holders of reverters or similar rights of entry, some of which were centuries old, from bringing legal proceedings to enforce the reverters unless notice of the same was filed in the appropriate register of deeds by a date eight years hence, *i.e.*, January 1, 1964. By so doing,

land title would be freed from the clouds and restrictions of ancient reservations of reversionary interests unless those interests were made the subject of a contemporaneous recording with proper indexing. The 1956 Limiting Act originally called for the filing of notice of reversionary interests no later than January 1, 1966.

Act provided, among other things, that no proceeding based upon any possible reversionary interest created before January 2, 1955, could be maintained either at law or in equity in any court unless on or before January 1, 1964, the party entitled to the reverter had "filed in the registry of deeds ... a statement in writing, duly sworn to, describing the land and the nature of the right and the deed or other instrument creating it, and where it may be found if recorded ... naming the person or persons appearing of record to own the fee subject to such right or possibility...." 1956 Mass.Act 258 § 2 (enacting new § 31A). Furthermore, the legislation stated that it applied

> to all such rights whether or not the owner thereof is a corporation or a charity or a government or governmental subdivision, or is under any disability or out of the commonwealth, and it shall apply notwithstanding any recitals in deeds or other instruments heretofore or hereafter recorded, unless a statement is filed as above provided.

*Id.*

The Commonwealth never filed the statement of its reversionary interest in Parcel 2 in the registry of deeds and, in fact, the Commonwealth made no such filing for other rights of entry or reverters that it held.

In 1968 the Massachusetts legislature amended the 1956 Limiting Act by adding language to exempt the Commonwealth from the filing requirement. As amended, the coverage section then read:

> This section shall apply to all such rights whether or not the owner thereof is a corporation or a charity or a government or governmental subdivision *other than the commonwealth,* ....

1968 Mass.Acts 496 (added language underlined).

Eighteen years after passage of the 1956 Limiting Act the Massachusetts Legislature, in 1974, yet again amended the Act by adding "clarifying" language to the effect that it had never been the intent of the legislature in 1956 to make the Common-

wealth subject to the Limiting Act. 1974 Mass.Acts 527. In a "statement of legislative purpose" the 1974 Act provided:

> The [legislature] notes that the insertion in the [the Act has], contrary to the legislative intent thereof, created the misapprehension that [it] applied to lands owned and conveyed by the commonwealth subject to certain limitations. The [legislature] further notes that, despite the longstanding canon of statutory construction that a procedural statute has retrospective as well as prospective effect, some misapprehension exists as to the proper construction of said section thirty-one A, as amended.... In order that the original intent of the legislature [in 1956] might now be clarified and the inapplicability of the above mentioned statutes to commonwealth grants and conveyances might be fixed with certainty, the [legislature] deems it necessary and in the public interest to enact this clarifying legislation.
>
> \* \* \* \* \* \*
>
> The provisions of [the Act], as most recently amended [in 1968], shall not be construed to apply to, and do not apply to, reversionary interests upon fee simple determinables or fee simples subject to the right of entry or condition broken of the commonwealth, whether created before or after the effective date of the passage of this act, in lands owned and conveyed by the commonwealth, notwithstanding any lapse of time or the passage of any prior law.
>
> \* \* \* \* \* \*
>
> This act shall be retrospective as well as prospective in its application, applying to all grants by the commonwealth whether created before or after its effective date.

*Id.*

The 1974 amendment, with its clarifying language, was enacted approximately one year after the United States publicly announced that it intended to close the South Boston Naval Annex as excess to its needs.

---

The Massachusetts legislature later amended the Act by providing that such notice be filed no later than January 1, 1964. 1961 Mass. Acts 448 § 5.

The Commonwealth of Massachusetts sought to garner title and exclusive jurisdiction over Parcel 2 (as well as Parcel 1 which is not in dispute in this case) by operation of law pursuant to the reverter clause of Section 2 of the 1941 legislative grant. The United States, however, initially refused to vacate the premises on the ground that the Commonwealth had lost its right of revestment by failing to comply with the filing requirements of the 1956 Limiting Act thereby leaving defendant with exclusive jurisdiction over the property, albeit with a cloud on the title. Defendant stood firm that plaintiff could gain possession and title to the land only by purchase. Plaintiffs disagreed. In order to put the property to a productive use and to relieve the federal government of the responsibility for "protection and maintenance costs pending disposition," the parties entered into an agreement on November 1, 1975, whereby plaintiff, Economic Development and Industrial Corporation of Boston (EDIC), took possession of and assumed "total responsibility for care and custody" of Parcel 2, less 2.18 acres. The agreement specified that any income received by plaintiff above that required for protection and maintenance costs was to be returned to the federal government. During the period November 1, 1975, through January 31, 1977, plaintiff secured tenants and collected rent in the amount of $482,-855.00, all of which was utilized by EDIC for protection and maintenance. The protection and maintenance agreement remained in effect until June 14, 1977, when the Commonwealth purchased the 64.82 acres of Parcel 2, over which it had assumed responsibility, for $1,587,300. Defendant refused to sell the remaining 2.18 acres of Parcel 2. In light of the title dispute over the 64.82 acres, the sales contract stipulated that the purchase price would be placed into a special account to be held by the Treasurer of the United States in a noninterest bearing account pending the outcome of litigation to be initiated by

the Commonwealth to determine if it could enforce the reverter. Immediately upon receipt of title to the 64.82 acres in 1977 the Commonwealth, through plaintiff, Government Land Bank, a Commonwealth instrumentality, conveyed its interest in the property to co-plaintiff, EDIC, another Commonwealth instrumentality, created by the Massachusetts Legislature to spur economic development in Boston. The 64.82 acres is part of what is now known as the Boston Marine Industrial Park. Plaintiffs have possessed and exclusively used the 64.82 acres of Parcel 2 from November 1, 1975. Plaintiffs have held title to the same property from June 4, 1977, to date.

Suit was filed in the United States Court of Claims in 1978 at about the same time suit was brought under the Quiet Title Act, 28 U.S.C. § 2409a, in the United States District Court for the District of Massachusetts. Proceedings in the Court of Claims were stayed pending outcome of the quiet title litigation. The district court in *Economic Development and Industrial Corporation v. United States*, 546 F.Supp. 1204 (D.Mass.1982), ruled that the 1956 Limiting Act originally applied to the Commonwealth but that the retroactive exclusion of the Commonwealth by the 1968 and 1974 amendments validly removed it from the scheme of the Act leaving plaintiffs with a valid right to enforce its reversionary interest in the courts. On appeal, the United States Court of Appeals for the First Circuit reversed and remanded the case with instructions to dismiss because the twelve-year statute of limitations on the quiet title action had run prior to the time suit had been filed and the district court was therefore without jurisdiction to decide the case. *Economic Dev. and Indus. Corp. v. United States*, 720 F.2d 1 (1st Cir.1983).[2]

Shortly thereafter, in 1984, the stay of proceedings was vacated in this court, plaintiffs filed an amended complaint and defendant filed a motion to dismiss for lack of subject matter jurisdiction. The court

---

**2.** The United States Court of Appeals for the First Circuit found that for purposes of an action under the Quiet Title Act the claim accrued on January 1, 1964. It held that the "accrual of

the right of action [occurred] when the plaintiff, or its predecessor in interest, 'knew or should have known of the claim of the United States.'" *EDIC*, 720 F.2d at 3.

denied defendant's motion to dismiss in a ruling from the bench but will reiterate its reasoning below. The present cross-motions for summary judgment followed.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether there is a genuine issue of material fact must be resolved in favor of the nonmoving party. *Housing Corp. v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). In addition, the "inferences to be drawn from the ... facts ... must be viewed in the light most favorable to the party opposing the motion" for summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Ball v. United States*, 1 Cl.Ct. 180, 183 (1982). The court is well aware that most just compensation claims are fact-intensive and a trial is generally required to determine the facts. *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). This case, the court believes, is an exception to the general rule in that the parties have stipulated to all of the necessary genuine issues of material fact. The case is properly before the court for disposition of the question of liability and partial damages on the cross-motions for summary judgment.[3]

*Jurisdiction*

Plaintiff maintained that defendant breached the terms of the 1941 legislative grant by unlawfully retaining possession of land to which plaintiff held title without just compensation. Defendant argued that plaintiff had no standing to bring this suit and that this court had no jurisdiction to adjudicate the issues. Defendant asserted that plaintiff's cause of action is not within the reach of the Tucker Act and in the alternative that even if it is, it is barred by the statute of limitations. 28 U.S.C. § 2501. Defendant, in 1985, moved for dismissal for lack of subject matter jurisdiction. Defendant argued that in accordance with *Block v. North Dakota*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), "Congress intended the [Quiet Title Act] to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Id.* at 286, 103 S.Ct. at 1819. This court, in a bench ruling, following oral argument on defendant's motion to dismiss, distinguished *Block* on the basis that the Quiet Title Act specifically excepted actions that could be brought under 28 U.S.C. § 1491. 28 U.S.C. § 2409a. Shortly thereafter, the United States Supreme Court in *United States v. Mottaz*, 476 U.S. 834, 106 S.Ct. 2224, 2233 & N. 12, 90 L.Ed.2d 841 (1986) stated: "we cannot conclude that Tucker Act-based suits ... are clearly precluded by the passage of the Quiet Title Act." *See also Bourgeois v. United States*, 212 Ct.Cl. 32, 35 n. 1, 545 F.2d 727, 729 n. 1 (1976) (Quiet Title Act does not deny jurisdiction in the United States Claims Court under 28 U.S.C. § 1491 where plaintiff can try the issue of title to land by seeking just compensation for a taking of the land by the United States).

In the present action plaintiff asserts jurisdiction in this court under contract and taking claims; one contract being the deed that memorialized the 1941 legislative grant of land, another being the November 1, 1975 protection and maintenance agreement, and yet a third, the June 14, 1977 purchase of the 64.82 acres. The taking claim, simply put, is that defendant took Parcel 2 in which plaintiff properly held title without just compensation.

In briefing and at oral argument on the present motions, defendant reiterated that

---

**3.** Plaintiffs termed their motion as a "partial" motion for summary judgment because, they opined, if they prevailed on the question of liability, damages for the taking of the 64.82 acres had been stipulated, *i.e.*, return of the $1,587,300 purchase price. There would remain to be negotiated, or litigated, damages for the taking of the 2.18 acres.

this court had "no jurisdictional or remedial power" over the issues presented by these facts and that the taking claim had been untimely filed. Defendant also argued that the issue of ownership of the 2.18 acres and easements over which defendant continued to claim title rest upon different grounds than the balance of the acreage making up Parcel 2. These issues will be discussed *seriatim*.

■ Defendant's argument that the court lacks jurisdiction to adjudicate the issues at bar is nothing more than a strawman to be readily disposed of by the court. Defendant stated that plaintiffs, in their original petition of June 13, 1978, alleged two bases for their suit against defendant; one sounding in contract (the written offer of purchase between plaintiff, Government Land Bank, and defendant and one sounding in tort (wrongful possession of the 2.18 acres). This court found jurisdiction predicated upon more than simply an offer by plaintiff to purchase Parcel 2. Jurisdiction of the court over the issue of ownership of Parcel 2 is based upon the just compensation clause of the Fifth Amendment to the Constitution and the 1977 executed contract of sale between the Government Land Bank, acting for the Commonwealth, and defendant.

Plaintiffs contended in 1978 and continue to do so to this day that it should not have been forced by defendant to purchase the 64.82 acres of Parcel 2 because it held title to that land by operation of the reverter clause of the 1941 Act and that the forced purchase of land it owned constituted a taking by defendant. That defendant admitted a taking might have occurred is evidenced by its agreement that the purchase price would be held in escrow and refunded to plaintiffs should a court determine that title had theretofore reverted to plaintiffs. Defendant has admitted that the contractual allegations appear to be clearly within the jurisdictional purview of this court.

The second challenge to this court's jurisdiction over the matter, *i.e.,* plaintiffs' contention that defendant was in wrongful possession of 2.18 acres of Parcel 2 sound-ed in tort, is without merit. As between two private parties, one wrongfully exercising the indicia of ownership over property claimed by the other by having and retaining possession in the face of demands to return the property to the rightful owner might well sound in tort and, as such, be beyond the jurisdiction of a court having no jurisdiction over tort claims. However, where the party possessing the property is the United States, and the possession is alleged to be not proper, the purported owner may properly bring a claim for just compensation under the Constitution. If it is true that defendant ceased using all or any portion of Parcel 2 for naval purposes, and that land, or a portion thereof, by operation of law through the reverter, became immediately the rightful property of the Commonwealth, the proper challenge to continued possession by the United States is under the Constitution. Defendant's argument that plaintiff did not file a taking claim but, a tort claim in 1978 is simply belied by the facts and documents before the court. A claim for a taking brought under the Tucker Act, such as the claim at issue in this case, is a claim "founded upon the Constitution" and within the jurisdiction of the Court of Claims to hear and determine within the meaning of 28 U.S.C. § 1491. *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 126, 95 S.Ct. 335, 350, 42 L.Ed.2d 320 (1974) (quoting *United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946) (construing jurisdiction of former Court of Claims under precursor of 28 U.S.C. § 1491)). As *Causby* indicates, the phrase "founded upon the Constitution" is broadly construed, and includes inverse condemnation claims. *See Armijo v. United States*, 229 Ct.Cl. 34, 36, 663 F.2d 90, 93 (Ct.Cl. 1981) ("The Court of Claims under § 1491 is more or less the clean-up man to take care of ... all ... instances" where property has been taken and "inadvertently, or purposely," just compensation has not been paid.); *Grasso v. United States Postal Serv.*, 438 F.Supp. 1231, 1234 (1977) (since complaint "asserts a taking of property without just compensation in violation of the Fifth Amendment" in excess of $10,-

000.00, § 1491 vests exclusive jurisdiction in Court of Claims).

■ Defendant also argued that because plaintiffs did not file a taking claim prior to January 13, 1984, the date of their amended complaint, their claim must necessarily be denied as being untimely filed. The statute of limitations applicable to this court requires that every claim must be brought within six years of the date the claim first accrued. 28 U.S.C. § 2501 (1982). The six-year statute of limitations is to be strictly construed. *Kirby v. United States*, 201 Ct.Cl. 527, 539 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974); *Cascade Dev. Co. v. United States*, 12 Cl.Ct. 587, 588 (1987). The dispositive question is whether plaintiffs' claim accrued anytime prior to a date six years before they filed their complaint.

■ A taking claim first accrues when all events have occurred which affect the alleged liability of the United States and entitle claimants to institute an action. *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 373 F.2d 356, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Defendant argued that the claim accrued on January 1, 1964, the last day that any holder of a future interest in land in Massachusetts must have filed notice to that effect pursuant to the 1956 Limiting Act. Plaintiffs were on notice, defendant continued, on that date in 1964 that defendant had a claim of fee simple title for all practicable purposes to Parcel 2 by virtue of the Commonwealth's failure to comply with the 1956 Limiting Act. By failing to protect their property interest in Parcel 2 by either filing notice of its interest prior to January 1, 1964 or by bringing suit prior to January 1, 1970, six years later, plaintiffs had no interest in Parcel 2 that could be taken.

■ The court rejects defendant's two-pronged argument that plaintiffs' taking claim was untimely filed. The argument is based upon two related false premises, *i.e.*, that the claim accrued in 1964 and that plaintiffs did not timely file a taking claim. The court wonders what case or controversy plaintiffs could have pled within the six-year period following January 1, 1964. Within the confines of the facts of this case, what claim accrued in 1964? What events had occurred affecting the rights of plaintiffs and the liability of the United States that would entitle plaintiffs to institute an action? Plaintiffs certainly had no cause of action against defendant because defendant held proper title and exclusive jurisdiction over Parcel 2 during the entire period 1964–1970 pursuant to the 1941 legislative grant. What had defendant taken? Use by consent cannot constitute a taking. *See, e.g., Armijo v. United States*, 229 Ct.Cl. 34, 38–40, 663 F.2d 90, 94–95 (1981); *United States v. Wood*, 466 F.2d 1385, 1388 (9th Cir.1972). It is only by some "assertion of possession" by the United States, to the exclusion of plaintiffs, after the termination of the prior consensual use which could cause a taking claim to accrue. *United States v. Herrero*, 416 F.2d 945, 947 (9th Cir.1969), *cert. denied*, 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed. 267 (1970), (citing *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958)); *see also United States v. Wood*, 466 F.2d at 1388. The court cannot accept defendant's argument that the claim accrued on January 1, 1964. Rather, the court finds that plaintiffs' claim of ownership over Parcel 2 accrued on November 1, 1975, the date that the parties stipulated defendant ceased using the property for naval purposes and executed the protection and maintenance agreement giving plaintiff EDIC restricted possession and jurisdiction, but not title, to 64.82 acres of Parcel 2.[4] November 1, 1975

---

4. Plaintiffs contend that one of the factors in this suit to be negotiated or litigated following a determination of liability in their favor is the date that the claim accrued. The court disagrees. The parties have stipulated that "[i]n November, 1975, the United States ceased to use the South Boston Naval Shipyard Annex (including Parcel 2 thereof, which is in issue in this lawsuit) for naval purposes." That stipulation, coupled with defendant's formal retrocession of Parcel 2 to the Commonwealth on November 10, 1975, plus the fact that plaintiffs took possession of 64.82 acres of Parcel 2 on November 1, 1975 pursuant to the protection and maintenance agreement makes it abundantly clear that any claim plaintiffs may have for

obviously falls well within the six-year period immediately preceding filing of the 1978 petition in the Court of Claims.[5]

◼ Defendant's argument that plaintiffs failed to allege a taking in their 1978 petition and are thereby now precluded from raising that issue is equally without basis. Defendant is correct in stating that plaintiffs never used the word "taking" in their 1978 petition but the inquiry cannot stop there. Rather, the court must look to the substance of the petition to determine what was sought. *Mutual Creamery Ins. Co. v. Iowa Nat'l Mut. Ins. Co.*, 427 F.2d 504, 507–08 (8th Cir.1970); *see Ritchie v. UMW*, 410 F.2d 827, 832 (6th Cir.1969). Moreover, "All pleadings shall be so construed as to do substantial justice." RUSCC 8(f). Paragraph 1 of the 1978 petition is rife with language which, if not expressly, at the least, strongly inferred that a taking was alleged. Paragraph 1 and 3(d) of the 1978 petition recite that plaintiff Government Land Bank purchased Parcel 2, less 2.18 acres, from defendant and that in the contract of purchase "the United States recognized that Plaintiff Land Bank asserted title to Parcel 2 by grant of the Commonwealth of Massachusetts, and agreed to hold $1,587,300 ... in escrow pending judicial resolution of title." Plaintiffs further recited that upon classification of Parcel 2 by defendant, with the concurrence of the Congress of the United States, as excess property, it ceased to be used for naval purposes thereby causing reversion of title to and jurisdiction in the Commonwealth pursuant to the 1941 legislative grant. Plaintiffs, in part, prayed that the court find that title to the 64.82 acres of Parcel 2 vested in it by operation of law through the reverter and not by their purchase of the land and that the purchase price be returned to them, as agreed. The court inescapably finds that

one claim of the 1978 petition was for a taking without just compensation.

◼ More importantly, the law and the rules of this court under circumstances present here permit an amended complaint to be given retroactive effect to the date of the first filing. RUSCC 15(a) provides for the filing of an amended complaint as a matter of right at any time before a response is served. A pleading may also be amended by leave of the court and such "leave shall be freely given when justice so requires." Subsection (c) of RUSCC 15 provides that "[w]herever the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment related back to the date of the original pleading." The records of the court show that defendant never answered the 1978 petition thereby giving to plaintiffs an unfettered right to file their amended complaint in 1984 relating back to the 1978 petition. *Burnstein v. Columbia Broadcasting Sys., Inc.*, 291 F.2d 8, 10 (7th Cir.1961) (filing of original petition within limitations period permits assertion of otherwise time-barred claim in amended complaint); *Doe v. O'Bannon*, 91 F.R.D. 442, 447 (E.D.Pa. 1981) (the *nunc pro tunc* principle of rule 15(c) ameliorates the effect of statutory bars to relief). If needed to put the matter at rest the court finds that justice required that the 1978 petition be amended by the 1984 complaint. The 1984 complaint contained a specific count alleging a taking and the court finds that the taking count without cavil "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The 1984 amended complaint, therefore, related back to the date of the 1978 pleading. RUSCC 15(c). *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1070 (5th Cir.1981) (claim asserted in the amended

---

either the 64.82 acres or the 2.18 acres accrued on November 1, 1975.

**5.** The court is not taking issue with the holding of the First Circuit in *Economic Development and Industrial Corporation v. United States*, 720 F.2d 1 (1st Cir.1983), that the date of accrual of the cause of action was January 1, 1964. The

date of accrual of a right of action in that case went only to the Quiet Title Act, 28 U.S.C. § 2409a. The case at bar is here under the Tucker Act, 28 U.S.C. § 1491, under which the date of accrual of a cause of action for a contract or taking claim is determined by a different and more exacting standard.

pleading arose out of the conduct or occurrence set forth in the original complaint and is, therefore, given retroactive effect to the date of the original complaint); *see also Ralcon, Inc. v. United States*, 12 Cl.Ct. 773 (1987). The court finds that plaintiffs filed a timely petition and that the petition, especially as amended by the 1984 complaint, asserted a taking claim for which it prayed for appropriate relief.

### Collateral Estoppel: Issue Preclusion

 Defendant repeated its request that the court collaterally estop plaintiffs in this action because statements of the United States Court of Appeals for the First Circuit addressed issues raised by plaintiffs in their brief and oral argument. In order to apply the doctrine of collateral estoppel plaintiffs' claim must have been actually litigated and the findings of the court must be essential to the judgment in the previous case. This court found in 1985 that plaintiffs' taking claim was not actually litigated because the United States Court of Appeals for the First Circuit concluded that it and the United States District Court for the District of Massachusetts were without jurisdiction to consider the merits of plaintiffs' quiet title claim. *Economic Dev. and Indus. Corp. v. United States*, 720 F.2d at 4. Moreover, any statements in that opinion addressed to the merits of plaintiffs' case here are not binding on this court because they were dicta and not essential to the determination that the quiet title action had been filed out of time. We do note that the Court of Appeals for the Federal Circuit has followed the general rule for "collateral estoppel" or "issue preclusion." *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1575–76 (Fed.Cir.1984). In accordance with that rule, there is no issue preclusion when the finding relied on is not essential, *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984), or was not litigated, *Young Engineers v. ITC*, 721 F.2d 1305, 1314 (Fed.Cir.1983), which is the case here. Accordingly, even if this court was inclined to collaterally estop plaintiffs it could not do so.

### The 1956 Limiting Act—Standing

A major step in resolving the taking claim requires a determination of whether the 1956 Limiting Act was applicable to the Commonwealth and, if so, whether the Massachusetts Legislature amended the 1956 Limiting Act so as to have revived the Commonwealth's cause of action. Do plaintiffs have standing to bring this action? The court finds that the clear, unambiguous language of the 1956 Limiting Act applied to the Commonwealth as "a government." Remaining is the issue of whether the Massachusetts Legislature could and did retroactively amend or define the strictures of the 1956 Limiting Act so as to restore the authority to the Commonwealth to judicially seek and enforce its interests, including possible future interests notwithstanding that it did not file notices of its future interests as required by the 1956 Limiting Act. In arguing that it cannot, defendant principally relied upon *Stewart v. Keyes*, 295 U.S. 403, 55 S.Ct. 807, 79 L.Ed. 1507 (1935), which held that once a state statute of limitations expired in a case involving real property and the deed had ripened into unassailable title, to lift the bar would be to arbitrarily take property from one having a perfect title and subject it to an extinguished claim of another, without due process of law. Defendant argued that the Commonwealth's failure to file notice of its future interest in Parcel 2 on or before January 1, 1964 merged the Commonwealth's interest (the possibility of reverter) with defendant's fee simple determinable interest so that for all practicable purposes the United States acquired fee simple title to the entirety of Parcel 2. However, defendant cites only one authority for the proposition that it acquired fee simple title, or its equivalent, to Parcel 2, J. Cribbett, *Principles of Law of Property*, 302 (2d ed. 1975), which, in the court's view, fails to adequately support this rationale.

 The court is of the opinion that the effect of the Commonwealth's failure to file notice of its reversionary interest did not vest the United States with fee simple

title to Parcel 2, it simply deprived the Commonwealth of any remedy to judicially enforce its right of reverter. *Chase Sec. Corp. v. Donaldson,* 325 U.S. 304, 313–16, 65 S.Ct. 1137, 1142–43, 89 L.Ed. 1628 (1945). The express language of the 1956 Limiting Act that "[n]o proceeding ... shall be maintained" operates to bar actions on unfiled rights, not to eliminate those rights. *Block v. North Dakota,* 461 U.S. 273, 291, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983), held that a claimant retained title to the disputed ownership of a tract of land even though the suit to quiet title was time-barred. *Id.* Similarly, in *United States v. Gammache,* 713 F.2d 588 (10th Cir.1983), the court found that the running of the twelve-year limitations period in the Quiet Title Act did not affect title to the property at issue. *Id.* at 591–594. In *Goodwin Brothers Leasing, Inc. v. Nousis,* 373 Mass. 169, 173, 366 N.E.2d 38, 41 (1977), the court found that a Massachusetts statute similar to the 1956 Limiting Act should be applied retroactively since it affected remedies rather than rights. The Court of Claims has stated in the context of a challenge to a retroactive regulation that:

> [I]t becomes necessary to consider whether, under all the circumstances, the 'retroactive application [of the regulation] is so harsh and oppressive as to transgress the constitutional limitation [imposed by the Fifth Amendment].' *Welch v. Henry,* 305 U.S. 134, 147 [59 S.Ct. 121, 126, 83 L.Ed. 87] (1938). Retroactive application of a regulation will not be declared unconstitutional unless after a balancing of the considerations on both sides it is determined that the regulation is unreasonable.

*Summit Nursing Home, Inc. v. United States,* 215 Ct.Cl. 581, 594, 572 F.2d 737, 743 (1978); *see also Hospital Data Center v. United States,* 225 Ct.Cl. 158, 163, 634 F.2d 541, 544 (1980). In *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945), Justice Holmes eloquently addressed this issue as follows:

> [W]here lapse of time has not invested a party with title to real or personal property, a state legislature, consistent with the Fourteenth Amendment, may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff his remedy, and divest the defendant of the statutory bar.

> \* \* \* \* \* \*

> [T]he prevailing judgment of the profession has revolted at the attempt to place immunities which exist only by reason of some slight technical defect on absolutely the same footing as those which stand on fundamental grounds.... [C]onstitutional rules, like those of the common law, end in a penumbra where the Legislature has a certain freedom in fixing the line.... [M]ultitudes of cases have recognized the power of the Legislature to call a liability into being where there was none before, if the circumstances were such as to appeal with some strength to the prevailing views of justice, and if the obstacle in the way of the creation seemed small.

*Chase Securities,* 325 U.S. at 311–15, 65 S.Ct. at 1140–42.

The Supreme Court has more recently held that the "harsh and oppressive" standard for retroactive legislation "does not differ from the prohibition against arbitrary and irrational legislation...." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733, 104 S.Ct. 2709, 2720, 81 L.Ed.2d 601 (1984).

Defendant's reliance on *Stewart v. Keyes,* 295 U.S. 403, 55 S.Ct. 807, 79 L.Ed. 1507 (1935), is misplaced because it turned on the proposition that an innocent third-party purchased the land for value and acquired "unassailable" title, *id.* at 416, 55 S.Ct. at 812, which is not present in the case at bar. Indeed, in that case a retroactive change in the law would have a harsh and oppressive effect on the bona fide purchaser. This court is of the opinion that the Commonwealth could retroactively amend the 1956 Limiting Act because neither defendant, nor any other party, had in the interim become vested with fee simple title. Since defendant did not acquire fee simple title both the 1968 and 1974 amendments are valid for purposes of this pro-

ceeding. The amendments did no more than restore to the Commonwealth its right to enforce its reversionary interest, which never ceased to exist, and which became significant when the United States ceased using the property for naval purposes. Thus, the amendments to the 1956 Limiting Act did not deprive defendant of property without due process of law.

It may have been with an excess of caution, but the United States took no action with respect to Parcel 2 in reliance upon the bar of the 1956 Limiting Act. In fact, to the contrary, the Department of the Navy in 1973 informed Congress that the entire South Boston Naval Shipyard Annex was excess to its needs and would revert to the Commonwealth pursuant to the original 1941 agreement between Massachusetts and the United States. That disposal report stated in pertinent part as follows:

Consideration: None. A portion to be reported to the General Services Administration as excess, part of which will revert to the Commonwealth of Massachusetts, a portion to be transferred to the Department of Interior for establishment of the "National Naval Park" and a portion to be transferred to the Department of the Army.

1. The Department of the Navy proposes to dispose of 357 acres of land with improvements thereon comprising the Boston Shipyard. The Shipyard is comprised of three areas: [one being] the South Boston Annex which contains 169 acres.... It is proposed to dispose of this property as follows:

\* \* \* \* \* \*

b. *South Boston Annex*

(1) 163 acres will be reported to GSA. Of this amount, 67 acres [Parcel 2] will revert to the Commonwealth of Massachusetts. (2) 6 acres will be transferred to the Department of the Army for use by Army, Navy and Marine Corps reserve purposes.

\* \* \* \* \* \*

2. This disposal is a result of the Navy's Shore Establishment Realignment program. The Department of Defense News Release of 17 April 1973 announced the relocation or disestablishment of the various functions at the Naval Shipyard between January 1974 and January 1975.

\* \* \* \* \* \*

4. The property to be excessed was acquired between 1800 and 1943 by purchase condemnation, donation, exchange from individuals and cession by the Commonwealth which was under the condition that 105 acres would revert to the Commonwealth when no longer used for Naval purposes.

On January 28, 1974, the House Armed Services Committee approved the proposed reversion. Soon thereafter, the Senate Armed Services Committee concurred. By letter of November 10, 1975, the United States formally retroceded jurisdiction over the entirety of Parcel 2 to the Commonwealth. That letter, addressed to the Governor of the Commonwealth of Massachusetts, informed him that the United States is vested with exclusive legislative jurisdiction over, among other lands, the "[f]ormer Boston Naval Shipyard (South Annex), Boston, Massachusetts—169.125 acres, more or less." The November 10th letter continued:

Section 2683 of Title 10, United States Code, authorizes the Secretary of the Navy to relinquish to a State or Commonwealth, all or part of the legislative jurisdiction over lands under his control in that State or Commonwealth.

\* \* \* \* \* \*

Accordingly, pursuant to authority duly delegated, there is hereby retroceded to the Commonwealth of Massachusetts all of the legislative jurisdiction held by the United States in all of the aforesaid lands.... This notice of relinquishment of jurisdiction is to take effect upon your acceptance thereof, or at such time as the laws of the Commonwealth may otherwise provide.

The quoted language from the 1973 report and the 1975 letter are recited here to show that at least as late as November 1975, defendant considered the Commonwealth's reversionary interest in Parcel 2

to be valid, that defendant had ceased using the entirety of Parcel 2 for naval purposes and that by law and by all standards of fairness, the land should have retroceded to the Commonwealth without the need for litigation.[6] Defendant's unilateral voluntary conduct further indicates that the retroactive effect of the Massachusetts statutes was not harsh, oppressive or unreasonable.

*Ownership of Parcel 2—The Taking*

In the interests of clarity, the court is compelled to discuss the issues surrounding the 64.82 acres and the 2.18 acres of Parcel 2 separately.

As previously recited, the parties stipulated that the United States ceased using 64.82 acres of Parcel 2 for naval purposes in November 1975. On November 1, 1975, defendant and plaintiff, EDIC, executed the protection and maintenance agreement that gave EDIC possession of and total responsibility for the care of 64.82 acres of Parcel 2 and the structures thereon in furtherance of its charter to spur economic development in the city of Boston. However, EDIC was required to pay over to the United States all funds received through its endeavors that exceeded protection and maintenance costs. Plaintiff, EDIC, expressly did not have title to the land and therefore could not enjoy all of the rights that a typical landowner would, such as the right to unconditionally use or alienate its interest in the land; nor could EDIC interfere with easements placed upon the land by defendant to assure railroad and automobile access to the 2.18 acres of land not included in the agreement. EDIC's rights were limited by and subservient to those of the United States even though at first glance its right of possession and use of the land would appear to be greater than it actually was. It was not until June 14, 1977, when plaintiff, Government Land Bank, on behalf of the Commonwealth, pur-

chased the land and transferred title, along with all the prerequisites of title, to EDIC that EDIC could fully enjoy and exercise the rights of a landowner. The converse is equally true. Until June 14, 1977, defendant withheld from EDIC at least some of the rights of a holder of fee simple title.

▄▄▄ The court is accordingly of the opinion, notwithstanding the November 1, 1975 transfer of possession of the land, that the United States temporarily took, without just compensation, the 64.82 acres from November 1, 1975, when it ceased using the property for naval purposes until June 14, 1977, when plaintiff, Government Land Bank, actually purchased the land. Plaintiffs' oft-repeated argument that the United States was guilty of a taking which continues until this day because it forced plaintiffs to purchase land to which they held title pursuant to the reverter is without merit. The temporary taking, with the exception of the easements, ceased on June 14, 1977, when the United States gave up all indicia of ownership of the 64.82 acres. The temporary taking of the easements does continue. Plaintiffs' disagreement with how defendant conducted itself with respect to the 64.82 acres less the easements after June 17, 1977, is a matter of contract, not taking.

There remains to be discussed the issue of the 2.18 acres of Parcel 2 that defendant has steadfastly refused to either retrocede title to and possession of, or sell to the Commonwealth. Defendant maintains, and has from at least November 1, 1975, that it is entitled to retain title of and exercise absolute jurisdiction over the 2.18 acres of Parcel 2 under the terms of the 1941 legislative grant because that land continues to be used for naval purposes.[7]

On February 26, 1976, some three months after the United States admittedly ceased use of Parcel 2 for naval purposes,

---

6. The governor of Massachusetts, on behalf of the Commonwealth, accepted the retrocession on March 9, 1976, and in so doing acknowledged the United States' claim to 2.18 acres and easements by accepting "without prejudice to the reversion to it of title to certain portions of the subject lands."

7. Defendant, at one point in its briefing, argued that because it continued to use the 2.18 acres for naval purposes it retained title to and jurisdiction over the entirety of Parcel 2. At oral argument defendant did not pursue that argument; neither will the court.

approximately 15 acres of the South Boston Naval Shipyard Annex which included the 2.16 acres at issue here were transferred to the United States Army for use as a site for parking and maintenance of Army vehicles. That use continues to this day. The naval purpose being met, argued defendant, is that on occasion throughout the year Army Reserve Units use the vehicles to practice loading and unloading ships at military ocean terminals located in Rhode Island and Boston, Massachusetts, but neither on the 2.18 acres nor on land abutting or even adjacent to the 2.18 acres. Defendant argued that this use satisfied the 1941 legislative grant. Defendant relied, in this instance, upon the "Emergency Preamble to the Act" which states in its entirety that:

> *Whereas,* the deferred operation of this action would tend to defeat its purpose, which is to provide land for the immediate extension of the navy dry dock property in Boston Harbor for the purposes of national defense, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety.

1941 Mass.Acts 535.

Defendant would have the court find that the reverter should be broadly defined and satisfied by any action of defendant that could conceivably be covered by the all encompassing term "national defense" as used in the preamble. According to defendant, use of the 2.18 acres as a parking and maintenance lot by the United States Army Reserve, being in the national defense would satisfy the requirement that the land had been and is used for naval purposes. *A fortiori,* title and possession of the 2.18 acres properly remain in the United States.

 Under the facts of this case, the court cannot find that the use of the 2.18 acres as a parking and maintenance lot for Army vehicles satisfies the requirement that the land be used for naval purposes, nor can the court find that the Emergency Preamble to the 1941 act redefines the specific requirement that the land be used for naval purposes by broadening the meaning of that term to encompass the entirety of the concept of national defense.[8] Included in this finding are the easements retained by defendant over the 64.82 acres which service the "landlocked 2.18 acres of Parcel 2." The sole purpose of the Emergency Preamble was to make the 1941 Act effective immediately,[9] not to define "naval purposes."

*Damages*

**A. The Purchase Price**

The United States Court of Appeals for the Federal Circuit in *Yuba National Resources, Inc. v. United States,* 821 F.2d 638 (Fed.Cir.1987), held that the guiding precept in any just compensation case is that the person whose property has been taken be justly compensated therefor pursuant to the language of the Fifth Amendment. A judicial literalization of that precept is: "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943) (footnotes omitted); *see also Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973); *San Diego Gas & Elec. Co. v. City of San Diego,* 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting on other grounds).

Where property is taken permanently, the owners' recovery is generally found to be based on the fair market value of the property taken, *i.e.,* what a willing buyer would pay a willing seller. *Yuba* at 641. Temporary takings should be analyzed in

---

**8.** The court also takes notice of the fact that under Massachusetts law preambles "do not take precedence over specific provisions" of the statutes they precede. *Cf. Town of Brookline v. Commissioner of Dep't of Envtl. Quality Eng'g,* 398 Mass. 404, 412, 497 N.E.2d 9, 14 (1986).

**9.** In the absence of a finding of emergency the 1941 Act, under Massachusetts law, would not have become effective for a period of several months.

the same Constitution framework. That is, the owner should be justly compensated. The United States Court of Appeals for the Federal Circuit relied upon *Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), in holding that for a temporary taking

> [T]he proper standard of compensation was the rental that probably could have been obtained, and not the difference between market values at the commencement and cessation of the taking.
>
> \* \* \* \* \* \*
>
> Th[is] court, comparing *Kimball Laundry,* stated, 'in the case of a temporary taking some injury to business is allowed to be awarded, with a careful explanation that this would not be so of a permanent taking.'

*Yuba,* 821 F.2d at 641 (quoting *Florida Rock Indus. v. United States,* 791 F.2d 893, 903 (Fed.Cir.1986)). See also *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 357 F.2d 988 (1966), relying on *Kimball Laundry* and *United States v. GMC,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), which held that a three-month taking prior to irreversible permanent taking was a temporary taking and that the measure of just compensation is rental value. *Yuba* at 821 F.2d at 641.

■ This court holds that plaintiffs are entitled to just compensation for the temporary taking of 2.18 acres of Parcel 2 and the easements over the 64.82 acres within Parcel 2 from November 1, 1975, until such time that defendant vacates the land and pays just compensation based on the fair market rental value of the time the United States temporarily took the land.[10] Plaintiffs are also entitled to just compensation on the same basis for the temporary taking of the 64.82 acres found by the court for the period November 1, 1975, through June 14, 1977. Plaintiffs are also entitled, under their contract claim, to return of the purchase price of $1,587,300 for the 64.82 acres.

### B. *Attorneys' Fees and Interest for Taking*

■ In view of the court's finding that there was a temporary taking of both the 64.82 acres and the 2.18 acres, plaintiffs are entitled to reimbursement of their reasonable costs, including attorneys fees for the respective periods of time pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c). An award of just compensation under the Fifth Amendment also entitles the property owner to interest from the date of the taking to the date of payment. *United States v. Thayer–West Point Hotel Co.,* 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1947); *Miller v. United States,* 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980); *Hedstrom Lumber Co. v. United States,* 7 Cl.Ct. 16, 33 (1984); *Jones v. United States,* 3 Cl.Ct. 4, 7 (1983). The law is not clear on whether interest is properly allowable in cases of a temporary taking where just compensation is based upon the fair market rental value of the land involved. The court is, however, of the opinion that interest should be a proper element of just compensation because it allows the aggrieved landowner to recoup lost interest that it stood to earn from invested profits from the monies it could have earned. It places the landowner in a position pecuniarily as it would have been had its land not been taken. *Yuba* at 640, *Miller,* 223 Ct.Cl. at 399, 620 F.2d at 837. For guidance in computing interest see *Foster v. United States,* 3 Cl.Ct. 738, 744–45 (1983) *aff'd,* 746 F.2d 1491 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985), where this court declared that:

> The Court of Claims established 7.5 percent as the appropriate rate for the period 1971–75; 8.5 percent as the appropriate rate for the period 1976–79.
>
> \* \* \* \* \* \*

The Contract Disputes Act requires interest on contract claims allowed under the Act to be paid at the rate established

---

**10.** The court recognizes that the United States may wish to continue using the 2.18 acres of Parcel 2 and the easements. If that is the case, it must either arrange to lease or purchase the land, or exercise a formal taking. But that is an issue for another day.

by the Secretary of the Treasury pursuant to Pub.L. No. 92–41 (85 Stat. 97). This method of establishing interest rates has the approval of Congress, and this court requires such rates to be paid on contract claims. Little justification is seen for utilization of another method to establish the rate that is to be included in just compensation in a taking case. Rates established under the Contract Disputes Act procedure for the following periods are:

| Period | Rate |
| --- | --- |
| Jan. – June 1980 | 12–1/4 percent |
| July – Dec. 1980 | 10–1/2 percent |
| Jan. – June 1981 | 14–5/8 percent |
| July – Dec. 1981 | 14–7/8 percent |
| Jan. – June 1982 | 14–3/4 percent |
| July – Dec. 1982 | 15–1/2 percent |
| Jan. – June 1983 | 11–1/4 percent |
| July – Dec. 1983 | 11–1/2 percent |
| [Jan. – June 1984 | 12–3/8 percent |
| July – Dec. 1984 | 14–3/8 percent |
| Jan. – June 1985 | 12–1/2 percent |
| July – Dec. 1985 | 10–3/8 percent |
| Jan. – June 1986 | 9–3/4 percent |
| July – Dec. 1986 | 8–1/2 percent |
| Jan. – June 1987 | 7–5/8 percent |
| July – Dec. 1987 | 8–7/8 percent] |

For purposes of uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency, rates established under the method required in the Contract Disputes Act [41 U.S.C. § 611 (1982)] are determined to be appropriate for computation of just compensation in this taking case....

In view of the court's finding that the claim for refund of the purchase price for the 64.82 acres is a contract claim plaintiffs are not entitled to interest on the $1,587,300 purchase price because there is no provision to that effect in the sales contract creating the special account; nor is it permitted by statute. *See The Confederated Salish and Kootenai Tribes of the Flathead Reservation v. United States,* 175 Ct.Cl. 451, *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). The Court of Claims there said:

For many decades Congress has forbidden interest on a plaintiff's claim in this court unless a contract or statute has 'expressly' provided for interest. 28 U.S.C. § 2516(a). This rule has won strict adherence in many kinds of cases, including Indian claims. Plaintiffs seek to come within the implied exception for a Fifth Amendment taking leading to the payment of 'just compensation' but we agree with the trial commissioner that there was no taking here.

*Confederated,* 175 Ct.Cl. at 454 (citations omitted).

## CONCLUSION

For the reasons stated plaintiffs' motion for partial summary judgment on liability is granted and defendant's motion for summary judgment is denied. Based upon the factual and legal issues before the court the amendments to the 1956 Limiting Act effectively and legally removed the Commonwealth from coverage of the Act thus giving plaintiffs standing to judicially enforce their reversionary interest. The court finds that the United States ceased using the entirety of Parcel 2 for naval purposes on November 1, 1975, and that title and the emoluments of title to the property should have reverted to the Commonwealth on that date by operation of the reversionary clause of the 1941 Act.

The parties are directed to meet in good faith to stipulate to the value of the temporary taking as recited above, interest and attorneys' fees and expenses thereon as permitted by this Order. The parties shall report to the court within 30 days of filing of this Order of the results of their negotiations. The parties are exhorted to use their best efforts to stipulate to all cost items so that this protracted litigation may finally come to an end. The court is prepared to assist the parties in any manner to meet this end. Costs to plaintiffs.

IT IS SO ORDERED.